649 F.2d 1354
 1981-1 Trade Cases 64,143
 INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE
WORKERS, (IAM), an association, Plaintiff-Appellant,
v.
The ORGANIZATION OF the PETROLEUM EXPORTING COUNTRIES
(OPEC); the Democratic and Popular Republic of Algeria
(Algeria); the Republic of Ecuador (Ecuador); the Gabonese
Republic (Gabon); Republic of Indonesia (Indonesia);
Imperial Government of Iran (Iran); Republic of Iraq (Iraq);
State of Kuwait (Kuwait); Libyan Arab Republic (Libya);
Federal Republic of Nigeria (Nigeria); State of Qatar
(Qatar); Kingdom of Saudi Arabia (Saudi Arabia); State of
United Arab Emirates, (United Arab Emirates); and the
Republic of Venezuela (Venezuela), Defendants-Appellees.
 No. 79-3673.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 5, 1980.
Decided July 6, 1981.
As Amended Aug. 24, 1981.
 
 James H. Davis, Los Angeles, Cal., for plaintiff-appellant.
 Antonin Scalia, Chicago, Ill., Khalid Abdullah Tariq Al Mansour, San Francisco, Cal., for defendants-appellees.
 Appeal from the United States District Court for the Central District of California.
 Richard I. Fine, amicus curiae per se.
 Before CHOY and NELSON, Circuit Judges, and SPEARS,* District Judge.
 CHOY, Circuit Judge:
 
 I. Introduction
 
 1
 The members of the International Association of Machinists and Aerospace Workers (IAM) were disturbed by the high price of oil and petroleum-derived products in the United States. They believed the actions of the Organization of the Petroleum Exporting Countries, popularly known as OPEC, were the cause of this burden on the American public. Accordingly, IAM sued OPEC and its member nations in December of 1978, alleging that their price-setting activities violated United States anti-trust laws. IAM sought injunctive relief and damages. The district court entered a final judgment in favor of the defendants, holding that it lacked jurisdiction and that IAM had no valid anti-trust claim.[1] We affirm the judgment of the district court on the alternate ground that, under the act of state doctrine, exercise of federal court jurisdiction in this case would be improper.
 
 II. Factual Background
 
 2
 IAM is a non-profit labor association. Its members work in petroleum-using industries, and like most Americans, they are consumers of gasoline and other petroleum-derived products. They object to the high and rising cost of such products.
 
 
 3
 OPEC is an organization of the petroleum-producing and exporting nations of what is sometimes referred to as the Third World. The OPEC nations have organized to obtain the greatest possible economic returns for a special resource which they hope will remove them from the ranks of the underdeveloped and the poverty-plagued. OPEC was formed in 1960 by the defendants Iran, Iraq, Kuwait, Saudi Arabia, and Venezuela. The other defendants, Algeria, Ecuador, Gabon, Indonesia, Libya, Nigeria, Qatar, and the United Arab Emirates, joined thereafter.
 
 
 4
 The OPEC nations produce and export oil either through government-owned companies or through government participation in private companies. Prior to the formation of OPEC, these diverse and sometimes antagonistic countries were plagued with fluctuating oil prices. Without coordination among them, oil was often in oversupply on the world market resulting in low prices. The OPEC nations realized that self-interest dictated that they "formulate a system to ensure the stabilisation (sic) of prices by, among other means, the regulation of production, with due regard to the interests of the producing and of the consuming nations, and to the necessity of securing a steady income to the producing countries, an efficient economic and regular supply of this source of energy to consuming nations " OPEC Resolution of the First Conference, Resolution 1.1(3), September 1960.
 
 
 5
 OPEC achieves its goals by a system of production limits and royalties which its members unanimously adopt. There is no enforcement arm of OPEC. The force behind OPEC decrees is the collective self-interest of the 13 nations.
 
 
 6
 After formation of OPEC, it is alleged, the price of crude oil increased tenfold and more. Whether or not a causal relation exists, there is no doubt that the price of oil has risen dramatically in recent years, and that this has become of international concern.
 
 
 7
 Supporters[2] of OPEC argue that its actions result in fair world prices for oil, and allow OPEC members to achieve a measure of economic and political independence. Without OPEC, they say, in the rush to the marketplace these nations would rapidly deplete their only valuable resource for ridiculously low prices.
 
 
 8
 Detractors accuse OPEC of price-fixing and worse in its deliberate manipulation of the world market and withholding of a resource which many world citizens have not learned to do without.[3]
 
 
 9
 In December 1978, IAM brought suit against OPEC and its member nations. IAM's complaint alleged price fixing in violation of the Sherman Act, 15 U.S.C. § 1, and requested treble damages and injunctive relief under the Clayton Act, 15 U.S.C. §§ 15, 16. IAM claimed a deliberate targeting and victimization of the United States market, directly resulting in higher prices for Americans.
 
 
 10
 The defendants refused to recognize the jurisdiction of the district court, and they did not appear in the proceedings below. Their cause was argued by various amici, with additional information provided by court-appointed experts. The district court ordered a full hearing, noting that the Foreign Sovereign Immunities Act (FSIA) prohibits the entry of a default judgment against a foreign sovereignty "unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e).
 
 
 11
 The district court initially dismissed OPEC, the organization, since it had not been properly served. It also determined at an early stage in the proceedings that monetary damages were foreclosed by the indirect-purchaser rule of Illinois Brick Co. v. Illinois, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). Thus the testimony at trial was directed to what remained of the complaint a suit for injunctive relief against the 13 OPEC nations individually.
 
 
 12
 The testimony was extensive. Experts in economics and international relations were examined and cross-examined. Exhibits, including masses of statistical and technical data, were received. A full day of legal argument concluded the proceedings below.
 
 
 13
 The record reflects an outstanding effort on the part of the district judge to amass the information necessary to understand the international politics and economy of oil and to marshal the legal arguments for and against IAM's requested relief.
 
 
 14
 At the close of the trial, the district judge granted judgment in favor of the defendants. The court held, first, that it lacked jurisdiction over the defendant nations under the Foreign Sovereign Immunities Act.[4] The court further held that even if jurisdiction existed in the first instance, the anti-trust action failed because foreign sovereigns are not persons within the meaning of the Sherman Act and because there was no proximate causal connection between OPEC activities and domestic price increases. The court also decided that default judgment could not properly lie against the non-appearing defendants, and that the defendants had not waived their immunity.
 
 III. Discussion
 A. Sovereign Immunity
 
 15
 In the international sphere each state[5] is viewed as an independent sovereign, equal in sovereignty to all other states. It is said that an equal holds no power of sovereignty over an equal. Thus the doctrine of sovereign immunity: the courts of one state generally have no jurisdiction to entertain suits against another state. This rule of international law developed by custom among nations. Also by custom, an exception developed for the commercial activities of a state. The former concept of absolute sovereign immunity gave way to a restrictive view. Under the restrictive theory of sovereign immunity, immunity did not exist for commercial activities since they were seen as non-sovereign.
 
 
 16
 In 1976, Congress enacted the FSIA and declared that the federal courts will apply an objective nature-of-the-act test[6] in determining whether activity is commercial and thus not immune: "The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d).
 
 
 17
 A critical step in characterizing the nature of a given activity is defining exactly what that activity is. The immunity question may be determined by how broadly or narrowly that activity is defined. In this case, IAM insists on a very narrow focus on the specific activity of "price fixing." IAM argues that the FSIA does not give immunity to this activity. Under the FSIA a commercial activity is one which an individual might "customarily carr(y) on for profit." H.R.Rep.No.94-1487, 94th Cong., 2d Sess. 16, reprinted in (1976) U.S.Code Cong. & Ad.News 6604, 6615. OPEC's activity, characterized by IAM as making agreements to fix prices, is one which is presumably done for profit; it is thus commercial and immunity does not apply.
 
 
 18
 The court below defined OPEC's activity in a different way: "(I)t is clear that the nature of the activity engaged in by each of these OPEC member countries is the establishment by a sovereign state of the terms and conditions for the removal of a prime natural resource to wit, crude oil from its territory." 477 F.Supp. at 567. The trial judge reasoned that, according to international law, the development and control of natural resources is a prime governmental function. Id. at 567-78. The opinion cites several resolutions of the United Nations' General Assembly, which the United States supported, and the United States Constitution, Art. 4, § 3, cl. 2, which treat the control of natural resources as governmental acts.
 
 
 19
 IAM argues that the district court's analysis strays from the path set forth in the FSIA. The control of natural resources is the purpose behind OPEC's actions, but the act complained of here is a conspiracy to fix prices. The FSIA instructs us to look upon the act itself rather than underlying sovereign motivations.
 
 
 20
 The district court was understandably troubled by the broader implications of an anti-trust action against the OPEC nations. The importance of the alleged price-fixing activity to the OPEC nations cannot be ignored. Oil revenues represent their only significant source of income. Consideration of their sovereignty cannot be separated from their near total dependence upon oil. We find that these concerns are appropriately addressed by application of the act of state doctrine. While we do not apply the doctrine of sovereign immunity, its elements remain relevant to our discussion of the act of state doctrine.
 
 B. The Act of State Doctrine
 
 21
 The act of state doctrine declares that a United States court will not adjudicate a politically sensitive dispute which would require the court to judge the legality of the sovereign act of a foreign state. This doctrine was expressed by the Supreme Court in Underhill v. Hernandez, 168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L.Ed. 456 (1897):
 
 
 22
 Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory.
 
 
 23
 The doctrine recognizes the institutional limitations of the courts and the peculiar requirements of successful foreign relations. To participate adeptly in the global community, the United States must speak with one voice and pursue a careful and deliberate foreign policy. The political branches of our government are able to consider the competing economic and political considerations and respond to the public will in order to carry on foreign relations in accordance with the best interests of the country as a whole. The courts, in contrast, focus on single disputes and make decisions on the basis of legal principles. The timing of our decisions is largely a result of our caseload and of the random tactical considerations which motivate parties to bring lawsuits and to seek delay or expedition. When the courts engage in piecemeal adjudication of the legality of the sovereign acts of states, they risk disruption of our country's international diplomacy. The executive may utilize protocol, economic sanction, compromise, delay, and persuasion to achieve international objectives. Ill-timed judicial decisions challenging the acts of foreign states could nullify these tools and embarrass the United States in the eyes of the world.
 
 
 24
 The act of state doctrine is similar to the political question doctrine in domestic law. It requires that the courts defer to the legislative and executive branches when those branches are better equipped to resolve a politically sensitive question. Like the political question doctrine, its applicability is not subject to clear definition. The courts balance various factors to determine whether the doctrine should apply.
 
 
 25
 While the act of state doctrine has no explicit source in our Constitution or statutes, it does have "constitutional underpinnings." Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 423, 84 S.Ct. 923, 937, 11 L.Ed.2d 804 (1964). The Supreme Court has stated that the act of state doctrine
 
 
 26
 arises out of the basic relationships between branches of government in a system of separation of powers The doctrine as formulated in past decisions expresses the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder rather than further this country's pursuit of goals both for itself and for the community of nations as a whole in the international sphere. Id.
 
 
 27
 The principle of separation of powers is central to our form of democratic government. Just as the courts have carefully guarded their primary role as interpreters of the Constitution and the laws of the United States, so have they recognized the primary role of the President and Congress in resolution of political conflict and the adoption of foreign policy. Compare Marbury v. Madison, 1 Cranch 137, 5 U.S. 137, 2 L.Ed. 60 (1803); Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964).
 
 
 28
 The doctrine of sovereign immunity is similar to the act of state doctrine in that it also represents the need to respect the sovereignty of foreign states. The two doctrines differ, however, in significant respects. The law of sovereign immunity goes to the jurisdiction of the court. The act of state doctrine is not jurisdictional. Ricaud v. American Metal Co., 246 U.S. 304, 309, 38 S.Ct. 312, 313, 62 L.Ed. 733 (1918). Rather, it is a prudential doctrine designed to avoid judicial action in sensitive areas. Sovereign immunity is a principle of international law, recognized in the United States by statute. It is the states themselves, as defendants, who may claim sovereign immunity. The act of state doctrine is a domestic legal principle, arising from the peculiar role of American courts. It recognizes not only the sovereignty of foreign states, but also the spheres of power of the co-equal branches of our government. Thus a private litigant may raise the act of state doctrine, even when no sovereign state is a party to the action. See, e. g., Timberlane Lumber Co. v. Bank of America, 549 F.2d 597, 606 (9th Cir. 1976). The act of state doctrine is apposite whenever the federal courts must question the legality of the sovereign acts of foreign states.
 
 
 29
 It has been suggested that the FSIA supersedes the act of state doctrine, or that the amorphous doctrine is limited by modern jurisprudence.[7] We disagree.
 
 
 30
 Congress in enacting the FSIA recognized the distinction between sovereign immunity and the act of state doctrine. See, e. g., H.R.Rep.No.94-1487, 94th Cong., 2d Sess. 20 n.1, reprinted in (1976) U.S.Code Cong. & Ad.News 6619 n.1 ("The Committee has found it unnecessary to address the act of state doctrine in this legislation"); see generally Jurisdiction of U.S. Courts in Suits Against Foreign States: Hearings on H.R.11315 Before the Subcomm. on Admin.Law and Governmental Relations of the House Comm. on the Judiciary, 94th Cong., 2d Sess. 29-57 (1976); Immunities of Foreign States: Hearings on H.R.3493 Before the Subcomm. on Claims & Governmental Relations of the Committee on the Judiciary, 93d Cong., 1st Sess. 20 (1973) (the FSIA "in no way affects existing law concerning the extent to which the 'act of state' doctrine may be applicable in similar circumstances"). Indeed, because the act of state doctrine addresses concerns central to our system of government, the doctrine must necessarily remain a part of our jurisprudence unless and until such time as a radical change in the role of the courts occurs.
 
 
 31
 The act of state doctrine is not diluted by the commercial activity exception which limits the doctrine of sovereign immunity. While purely commercial[8] activity may not rise to the level of an act of state, certain seemingly commercial activity will trigger act of state considerations. As the district court noted, OPEC's "price-fixing" activity has a significant sovereign component. While the FSIA ignores the underlying purpose of a state's action, the act of state doctrine does not. This court has stated that the motivations of the sovereign must be examined for a public interest basis. Timberlane, 549 F.2d at 607. When the state qua state acts in the public interest, its sovereignty is asserted. The courts must proceed cautiously to avoid an affront to that sovereignty. Because the act of state doctrine and the doctrine of sovereign immunity address different concerns and apply in different circumstances, we find that the act of state doctrine remains available when such caution is appropriate, regardless of any commercial component of the activity involved.
 
 
 32
 In addition to the public interest factor, a federal court must heed other indications which call for act of state deference. The doctrine does not suggest a rigid rule of application. In the Sabbatino case, the Supreme Court suggested a balancing approach:
 
 
 33
 some aspects of international law touch more sharply on national nerves than do others; the less important the implications of an issue are for our foreign relations, the weaker the justification for exclusivity in the political branches. 376 U.S. at 428, 84 S.Ct. at 940.
 
 
 34
 The decision to deny access to judicial relief is not one we make lightly. In Timberlane Lumber Co. v. Bank of America, 549 F.2d 597, 606 (9th Cir. 1976), this court noted that "not every case is identical in its potential impact on our relations with other nations." The "touchstone" or "crucial element" is the potential for interference with our foreign relations. Timberlane, 549 F.2d at 607. This court has stated:
 
 
 35
 we do not wish to challenge the sovereignty of another nation, the wisdom of its policy, or the integrity and motivation of its action. On the other hand, repeating the terms of Sabbatino, "the less important the implications of an issue are for our foreign relations, the weaker the justification for exclusivity in the political branches." Id. (Citations omitted.)
 
 
 36
 There is no question that the availability of oil has become a significant factor in international relations. The growing world energy crisis has been judicially recognized in other cases. See, e. g., Occidental of UMM al Qaywayn, Inc. v. A Certain Cargo of Petroleum, 577 F.2d 1196 (5th Cir. 1978), cert. denied, 442 U.S. 928, 99 S.Ct. 2857, 61 L.Ed.2d 296 (1979) (dismissing an action to determine rights to oil in the Persian Gulf as raising a nonjusticiable political question); Hunt v. Mobil Oil Corp., 550 F.2d 68, 78 (2d Cir.) cert. denied, 434 U.S. 984, 98 S.Ct. 608, 54 L.Ed.2d 477 (1977) (affirming, on the basis of the act of state doctrine, dismissal of anti-trust claim where the act complained of was part of "a continuing and broadened confrontation between the East and West in an oil crisis which has implications and complications far transcending those suggested by appellants"). The record in this case contains extensive documentation of the involvement of our executive and legislative branches with the oil question. IAM does not dispute that the United States has a grave interest in the petro-politics of the Middle East, or that the foreign policy arms of the executive and legislative branches are intimately involved in this sensitive area. It is clear that OPEC and its activities are carefully considered in the formulation of American foreign policy.
 
 
 37
 The remedy IAM seeks is an injunction against the OPEC nations. The possibility of insult to the OPEC states and of interference with the efforts of the political branches to seek favorable relations with them is apparent from the very nature of this action and the remedy sought. While the case is formulated as an anti-trust action, the granting of any relief would in effect amount to an order from a domestic court instructing a foreign sovereign to alter its chosen means of allocating and profiting from its own valuable natural resources. On the other hand, should the court hold that OPEC's actions are legal, this "would greatly strengthen the bargaining hand" of the OPEC nations in the event that Congress or the executive chooses to condemn OPEC's actions. Sabbatino, 376 U.S. at 432, 84 S.Ct. at 942.
 
 
 38
 A further consideration is the availability of internationally-accepted legal principles which would render the issues appropriate for judicial disposition. As the Supreme Court stated in Sabbatino,
 
 
 39
 It should be apparent that the greater the degree of codification or consensus concerning a particular area of international law, the more appropriate it is for the judiciary to render decisions regarding it, since the courts can then focus on the application of an agreed principle to circumstances of fact rather than on the sensitive task of establishing a principle not inconsistent with the national interest or with international justice. 376 U.S. at 428, 84 S.Ct. at 940.
 
 
 40
 While conspiracies in restraint of trade are clearly illegal under domestic law, the record reveals no international consensus condemning cartels, royalties, and production agreements.[9] The United States and other nations have supported the principle of supreme state sovereignty over natural resources. The OPEC nations themselves obviously will not agree that their actions are illegal. We are reluctant to allow judicial interference in an area so void of international consensus. An injunction against OPEC's alleged price-fixing activity would require condemnation of a cartel system which the community of nations has thus far been unwilling to denounce. The admonition in Sabbatino that the courts should consider the degree of codification and consensus in the area of law is another indication that judicial action is inappropriate here.
 
 
 41
 The district court was understandably reluctant to proceed on the complaint below and the act of state doctrine provides sound jurisprudential support for such reluctance. While the act of state doctrine does not compel dismissal as a matter of course, in a case such as this where the controlling issue is the legality of a sovereign act and where the only remedy sought is barred by act of state considerations dismissal is appropriate.
 
 IV. Conclusion
 
 42
 The act of state doctrine is applicable in this case. The courts should not enter at the will of litigants into a delicate area of foreign policy which the executive and legislative branches have chosen to approach with restraint. The issue of whether the FSIA allows jurisdiction in this case need not be decided, since a judicial remedy is inappropriate regardless of whether jurisdiction exists. Similarly, we need not reach the issues regarding the indirect-purchaser rule, the extra-territorial application of the Sherman Act, the definition of "person" under the Sherman Act, and the propriety of injunctive relief.
 
 
 43
 The decision of the district court dismissing this action is AFFIRMED.
 
 
 
 *
 The Honorable Adrian A. Spears, Senior United States District Judge for the Western District of Texas, sitting by designation
 
 
 [1]
 The district court opinion is reported at 477 F.Supp. 553 (C.D.Cal.1979)
 
 
 [2]
 See, e. g., Amuzegar, OPEC in the Context of the Globel Power Equation, 4 Denver, J. Int'l L. & Pol'y 221 (1974); Shihata, Arab Oil Policies and the New International Economic Order, 16 Virginia J. Int'l L. 261 (1976)
 
 
 [3]
 IAM refers to the demand for oil as "inelastic" a demand which exists regardless of price. While this conclusion is subject to dispute, the record reflects a persistent world demand for this commodity
 
 
 [4]
 The Foreign Sovereign Immunities Act of 1976, 90 Stat. 2891, codified at 28 U.S.C. § 1330, actions against foreign states, which states:
 (a) The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605-1607 of this title or under any applicable international agreement;
 and 28 U.S.C. §§ 1602, et seq., which states in relevant part:
 § 1602. Findings and declaration of purpose
 The Congress finds that the determination by United States courts of the claims of foreign states to immunity from the jurisdiction of such courts would serve the interests of justice and would protect the rights of both foreign states and litigants in United States courts. Under international law, states are not immune from the jurisdiction of foreign courts insofar as their commercial activities are concerned, and their commercial property may be levied upon for the satisfaction of judgments rendered against them in connection with their commercial activities. Claims of foreign states to immunity should henceforth be decided by courts of the United States and of the States in conformity with the principles set forth in this chapter.
 § 1605. General exceptions to the jurisdictional immunity of a foreign state
 (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case
 (2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.
 
 
 [5]
 In accordance with international usage, the term "states" refers to nations as opposed to the domestic states of the United States
 
 
 [6]
 The categorization of activity as commercial or non-commercial is a source of controversy. Two different tests arose to determine the character of state activity. One focused on the purpose of the activity, the other on the nature of the activity. The purpose test, which asks whether the act in question was undertaken for sovereign ends, is subjective. The nature test, which focuses on the nature of the act itself, is objective. The purpose test grants broader immunity, since even the most commercial activity could have an underlying governmental purpose. For example, the purchase of furniture is objectively a commercial act. If the furniture is purchased for a state's embassy, however, under the purpose test, the act is sovereign and immunity applies. The problem with the purpose test is that the expectations of the furniture seller relying on the commercial appearance of the activity would be frustrated if the foreign government could claim immunity and disclaim its obligation to pay. Only the objective test would protect the seller's reliance on the nature and appearance of the purchase as commercial activity subject to domestic laws
 
 
 [7]
 See n.8, infra; Occidental Petroleum Corp. v. Buttes Gas & Oil Co., 331 F.Supp. 92, 111 (1971), aff'd, 461 F.2d 1261 (9th Cir.), cert. denied, 409 U.S. 950, 93 S.Ct. 272, 34 L.Ed.2d 221 (1972) (noting and rejecting the contention that the act of state doctrine "has been sapped of its vitality and rationale" by the "Sabbatino Amendment," 22 U.S.C. § 2370(e)(2))
 
 
 [8]
 In Alfred Dunhill of London, Inc. v. Cuba, 425 U.S. 682, 698, 96 S.Ct. 1854, 1863, 48 L.Ed.2d 301 (1976), the court held that purely commercial activity does not require judicial deference under the act of state doctrine. The Dunhill case suggested but did not decide the question of whether the act of state doctrine is subsumed by the doctrine of sovereign immunity. Compare opinion of Justice White, 425 U.S. 682, 705 at n.18, 96 S.Ct. 1854, 1866 at n.18, 48 L.Ed.2d 301, with Justice Marshall's dissent, at 725-728, 96 S.Ct. at 1875
 
 
 [9]
 The amici suggest that production quotas and royalties are accepted sovereign practices, citing, inter alia, the Connally Hot Oil Act, 15 U.S.C. § 715; United States' payment to farmers not to produce wheat; and Japan's voluntary reduction of TV and automobile production to maintain prices