**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| SEA BREEZE SALT, INC., a California corporation; INNOFOOD, S.A. DE C.V., a Mexican corporation, *Plaintiffs-Appellants*, | No. 16-56350 |
| | D.C. No. 2:16-cv-02345-DMG-AGR |
| v. | |
| MITSUBISHI CORPORATION, a Japanese corporation; MITSUBISHI INTERNATIONAL CORPORATION, a New York corporation; EXPORTADORA DE SAL, S.A. DE C.V., a Mexican corporation; DOES, 1–10, *Defendants-Appellees.* | OPINION |

Appeal from the United States District Court
for the Central District of California
Dolly M. Gee, District Judge, Presiding

Argued and Submitted November 8, 2017
Pasadena, California

Filed August 15, 2018

Before:  Kim McLane Wardlaw and Andrew D. Hurwitz,[*] Circuit Judges, and Wiley Y. Daniel,[**] District Judge.

Opinion by Judge Wardlaw

_____

**SUMMARY**[***]

_____

**Act of State Doctrine**

The panel affirmed the district court's dismissal of an antitrust case as barred by the act of state doctrine.

Plaintiffs alleged an antitrust conspiracy between a Mexican salt production corporation 51-percent owned by the government of Mexico and a Japanese entity that held the remaining ownership interest.  The panel held that the act of state doctrine applied because the antitrust action was fundamentally a challenge to the United Mexican States' determination about the exploitation of its own natural resources, made by a corporation owned and controlled by the Mexican government.

_____

[*] This case was submitted to a panel that included Judge Stephen Reinhardt.  Following Judge Reinhardt's death, Judge Hurwitz was drawn by lot to replace him.  Ninth Circuit General Order 3.2.h.  Judge Hurwitz has read the briefs, reviewed the record, and listened to oral argument.

[**] The Honorable Wiley Y. Daniel, United States District Judge for the U.S. District Court for Colorado, sitting by designation.

[***] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

## COUNSEL

Rory S. Miller (argued), David Zarmi, and G. Jill Basinger, Glaser Weil Fink Howard Avchen & Shapiro LLP, Los Angeles, California, for Plaintiffs-Appellants.

Charles E. Davidow (argued) and Daniel A. Crane, Paul Weiss Rifkind Wharton & Garrison LLP, Washington, D.C., for Defendants-Appellees.

## OPINION

WARDLAW, Circuit Judge:

The act of state doctrine limits judicial interference in foreign relations by precluding adjudication of the sovereign acts of other nations in United States courts. Because this antitrust action is fundamentally a challenge to the United Mexican States' determination about the exploitation of its own natural resources, made by a corporation owned and controlled by the Mexican government, it is barred by the act of state doctrine. We therefore affirm the district court's dismissal of the complaint.

## I.

Plaintiffs, Innofood, S.A. de C.V. ("Innofood"), a Mexican corporation with a principal place of business in Mexico, and Sea Breeze Salt, Inc. ("Sea Breeze"), a California corporation based in San Diego, brought this suit in the Central District of California, alleging an antitrust conspiracy between Exportadora de Sal, S.A. de C.V. ("ESSA"), a Mexican salt production corporation 51-percent owned by the government of Mexico, and Mitsubishi Corporation, a Japanese entity which holds the remaining

ownership interest in ESSA.[1]     Plaintiffs also named Mitsubishi International Corporation, a New York corporation and wholly owned subsidiary of Mitsubishi Corporation.

According to the operative complaint, ESSA is the world's largest producer of solar sea salt, and produces 90 percent of Mexico's salt exports. This amounts to almost 17 percent of the total global output of salt. The complaint further alleges that "[f]or decades, Mitsubishi has enjoyed a monopolistic stranglehold on ESSA's solar sea salt production, distribution, and sales." That is, ESSA sold its salt exclusively to Mitsubishi. That began to change when Jorge Lopez Portillo Basave ("Portillo"), a reformist, took over as ESSA's Director General and began developing distribution contracts with other companies.

In February 2014, Portillo entered a contract with Innofood for the distribution of solar sea salt. However, ESSA terminated Portillo in late 2014. ESSA then refused to honor multiple purchase orders issued by Innofood under the distribution contract. Plaintiffs allege that this conduct was part of an orchestrated scheme to breach all the outside distribution contracts that Portillo had entered, and to return to dealing exclusively with Mitsubishi.

Innofood alleges that ESSA's breach precluded Innofood from fulfilling its contractual obligation to resell ESSA's salt to Sea Breeze. Sea Breeze in turn was unable

---

[1] ESSA's amenability to suit in the United States is also at issue in *Packsys, S.A. de C.V. v. Exportadora de Sal, S.A. de C.V.,* No. 16-55380, decided today.

to fulfill deals it had in place with purchasers in the United States.

Innofood and Sea Breeze base five claims on ESSA's alleged decision to sell its salt exclusively to Mitsubishi: (1) illegal restraint of trade in violation of the Sherman Act, 15 U.S.C. § 1; (2) unlawful exclusive agreement in violation of the Clayton Act, 15 U.S.C. § 14; (3) unlawful restraint of trade in violation of California's Cartwright Act, Cal. Bus. & Prof. Code §§ 16720 *et seq.*; (4) intentional interference with contractual relations under California law; and (5) intentional interference with prospective economic advantage under California law.

The Mitsubishi defendants moved to dismiss based on the act of state doctrine, *forum non conveniens*, and failure to state a claim. The district court dismissed the action as barred by the act of state doctrine, and therefore did not reach Mitsubishi's other arguments. It held that (1) the alleged conduct constituted the official acts of a foreign sovereign within its own borders, (2) relief would require the court to declare invalid the official acts of that foreign sovereign, and (3) no exception to the act of state doctrine applied.

ESSA was never served with process. A month after the district court dismissed the claims against Mitsubishi, it also dismissed the claims as to ESSA, for failure to serve and because "the grounds on which the case was dismissed as to the Mitsubishi defendants would in fact apply with equal (if not greater) force to ESSA if it were to have been served with process." Innofood and Sea Breeze timely appealed both dismissals.

## II.

"[W]e review the district court's decision concerning the act of state doctrine de novo." *Liu v. Republic of China*, 892 F.2d 1419, 1424 (9th Cir. 1989). When the doctrine is raised on a motion to dismiss, we take the allegations in the complaint as true and view them in the light most favorable to the plaintiffs. *Clayco Petroleum Corp. v. Occidental Petroleum Corp.*, 712 F.2d 404, 406 (9th Cir. 1983) (per curiam).

## III.

The district court correctly dismissed this case under the act of state doctrine. Unlike the Foreign Sovereign Immunities Act ("FSIA"), which is jurisdictional,[2] the act of state doctrine is a "substantive defense on the merits." *Republic of Austria v. Altmann*, 541 U.S. 677, 700 (2004). The doctrine is "a consequence of the domestic separation of powers, reflecting 'the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder' the conduct of foreign affairs." *W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l*, 493 U.S. 400, 404 (1990) (quoting *Banco Nacional de*

---

[2] Because the FSIA is jurisdictional, we must assure ourselves that it does not bar this suit, even though the issue is not pressed on appeal. *See, e.g.*, *In re Rosson*, 545 F.3d 764, 769 n.5 (9th Cir. 2008). We agree with the district court that the FSIA's commercial activity exception is applicable because the suit is based upon "an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2); *see Packsys, S.A. de C.V. v. Exportadora de Sal, S.A. de C.V.,* No. 16-55380, slip op. at 19 n.10 (discussing the "direct effect" test where a foreign state's action causes the breach of third-party contracts with United States companies). The FSIA therefore does not deprive us of jurisdiction.

*Cuba v. Sabbatino*, 376 U.S. 398, 423 (1964)).  It recognizes that "[w]hen the courts engage in piecemeal adjudication of the legality of the sovereign acts of states, they risk disruption of our country's international diplomacy."  *Int'l Ass'n of Machinists v. Org. of Petroleum Exporting Countries*, 649 F.2d 1354, 1358 (9th Cir. 1981) (*IAM*).  Because it arises from the separation of powers between the judicial and executive branches, the doctrine is said to have "constitutional underpinnings."  *Sabbatino*, 376 U.S. at 423 (internal quotation marks omitted).

As a doctrinal matter, the "classic statement" of the act of state doctrine is that "[e]very sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory."  *Credit Suisse v. U.S. Dist. Court*, 130 F.3d 1342, 1346 (9th Cir. 1997) (quoting *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897)).  In its modern formulation, the doctrine bars suit where "(1) there is an official act of a foreign sovereign performed within its own territory; and (2) the relief sought or the defense interposed [in the action would require] a court in the United States to declare invalid the [foreign sovereign's] official act."  *Id.* (quoting *W.S. Kirkpatrick & Co.*, 493 U.S. at 405) (alterations in original; internal quotation marks omitted).  In evaluating the act of state doctrine, we also consider the extent to which "the policies underlying" the doctrine "justify its application."  *W.S. Kirkpatrick & Co.*, 493 U.S. at 409.

## A.  *Official Act of a Foreign Sovereign*

The district court correctly held that this action challenges the official act of a foreign sovereign performed within its own territory.

As an initial matter, ESSA's actions, to the extent they constitute official acts, are the acts of the Mexican government.  The Mexican government owns 51 percent of ESSA and appoints a majority of its board of directors and its Director General, a position equivalent to the Chief Executive Officer of an American company.  Given that a government must always act through agents, it makes no difference for act of state purposes whether that agent is an individual, an agency, or a majority-owned and controlled corporation, so long as the acts in question are official, sovereign acts.  *See Samantar v. Yousuf*, 560 U.S. 305, 322 (2010) ("We have recognized, in the context of the act of state doctrine, that an official's acts can be considered the acts of the foreign state . . . .") (citing *Underhill*, 168 U.S. at 252, 254); *cf.* 28 U.S.C. § 1603(a), (b) (providing that a corporation majority-owned by a foreign government is a "foreign state" for foreign sovereign immunity purposes).  Thus, we have applied the act of state doctrine to the oil-production decisions of the Organization of the Petroleum Exporting Countries ("OPEC") member nations, notwithstanding the fact that "[t]he OPEC nations produce and export oil either through government-owned companies or through government participation in private companies." *IAM*, 649 F.2d at 1355.  We make explicit here what was implicit in that holding: that an official act for purposes of the act of state doctrine may be performed by an instrumentality of a foreign sovereign, such as a government-owned corporation.  The critical question is not the identity of the actor, but rather the nature of the act itself.

Plaintiffs do not appear to argue that ESSA's corporate status precludes application of the act of state doctrine; instead, they contend that the specific conduct alleged here did not constitute a sovereign, official act.  However, a long line of decisions by this and other courts of appeals holds

that a nation's decisions about the exploitation of its own natural resources are quintessentially sovereign in nature.

In *IAM*, an American trade union sued the OPEC nations for alleged violations of United States antitrust laws, arguing that the countries' oil-production decisions amounted to an illegal price-fixing conspiracy. 649 F.2d at 1356. Noting "the principle of supreme state sovereignty over natural resources," we held that the act of state doctrine barred the suit because "the controlling issue is the legality of a sovereign act," namely, the OPEC states' decisions about the proper disposition of their natural resources. *Id.* at 1361.

Drawing on our analysis in *IAM*, the Fifth Circuit held that the act of state doctrine barred an antitrust suit against the OPEC nations' policies of "controlling the spigot" of oil production. *Spectrum Stores, Inc. v. Citgo Petroleum Corp.*, 632 F.3d 938, 944 (5th Cir. 2011). The court recognized that "[t]he Supreme Court has held, albeit in a different factual context, that exploitation of natural resources is an inherently sovereign function," *id.* at 954 (citing *United States v. California*, 332 U.S. 19, 38–39 (1947)), and concluded that "the complaints seek a remedy that is barred by the act of state doctrine, that is, an order and judgment that would interfere with sovereign nations' control over their own natural resources," *id.* at 943.

Similarly, we have held that a suit challenging the validity of a nation's grant of an off-shore oil concession was barred by the act of state doctrine because "the underlying dispute . . . concerns a sovereign decision authorizing exploitation of important natural resources." *Clayco*, 712 F.2d at 407–08. We have noted in the foreign sovereign immunity context that a license to capture and export Bangladeshi rhesus monkeys "concerned Bangladesh's right to regulate its natural resources, also a uniquely sovereign

function." *MOL, Inc. v. Peoples Republic of Bangl.*, 736 F.2d 1326, 1329 (9th Cir. 1984). And the D.C. Circuit, also drawing on our *IAM* decision, was left with "no doubt that issuance of a license permitting the removal of uranium from Kazakhstan is a sovereign act" for act of state purposes. *World Wide Minerals, Ltd. v. Republic of Kaz.*, 296 F.3d 1154, 1165 (D.C. Cir. 2002).

These cases dictate the conclusion that ESSA's choice to deal exclusively with Mitsubishi is a sovereign act. Under Mexico's Constitution, "the government of Mexico is the only entity that may own and exploit the country's natural resources," including by "creat[ing] organizations that manage and distribute these resources." *Corporacion Mexicana de Servicios Maritimos, S.A. de C.V. v. M/T Respect*, 89 F.3d 650, 653 (9th Cir. 1996). Sea salt is explicitly included within the list of natural resources that the Mexican Constitution commits to state ownership:

> In the Nation is vested the direct ownership . . . of all minerals or substances, which in veins, ledges, masses or ore pockets, form deposits of a nature distinct from the components of the earth itself; such as . . . rock-salt and *the deposits of salt formed by sea water* . . . .

Constitución Política de los Estados Unidos Mexicanos, Art. 27 (emphasis added). Mexico's salt is a sovereign natural resource; our precedent, and that of other circuits, teaches that its exploitation is therefore a sovereign act.

Plaintiffs attempt to evade this authority, arguing that ESSA's conduct is distinguishable from the granting of natural resource concessions or the production decisions involved in the OPEC cases. They contend that their suit

challenges nothing more than "everyday commercial decisions" about salt that has already been extracted, and that these commercial decisions are performed by a government-owned entity only "by happenstance."

But plaintiffs' argument inaccurately characterizes the conduct alleged in their own complaint. At the core of the complaint is an allegation that Mexico—through ESSA—has decided to distribute and export the nation's sea salt *exclusively* through Mitsubishi. That is not a decision about individual lots of already-produced salt; rather, it is a policy regarding the disposition of substantially all of the salt Mexico exports on an ongoing basis. It is not an "everyday commercial decision" or one that, "by happenstance," could have been made by a private company. We see no meaningful distinction between granting a foreign company an exclusive concession to extract salt—which plaintiffs appear to concede would be a sovereign act—and extracting that salt through a government-owned company under a policy by which the entire output is sold exclusively to one buyer.

The acts alleged in the complaint also occurred in Mexico; that is, they were "official act[s] of a foreign sovereign performed within its own territory." *Credit Suisse*, 130 F.3d at 1346 (quoting *W.S. Kirkpatrick & Co.*, 493 U.S. at 405). As alleged in the complaint, ESSA has its principal place of business in Mexico, and extracts and processes its salt in Mexico. There is nothing to suggest that this state-owned Mexican corporation made its decisions about the distribution of Mexico's salt anywhere other than within Mexico. *See Spectrum Stores*, 632 F.3d at 955 n.18 ("[A] country's decisions about how much of its [resources] to extract take place exclusively within that country."). Moreover, ESSA's alleged breach of the Innofood contract

also occurred in Mexico, where the salt was to be delivered. The first requirement for the application of the act of state doctrine is therefore met.

## B.  *Invalidation of an Official Act*

The district court also correctly determined that the relief sought by plaintiffs would require a United States court to invalidate Mexico's sovereign decisions about the exploitation of its natural resources.  *See Credit Suisse*, 130 F.3d at 1346.

Again, the OPEC cases are instructive.  In *IAM*, we held that the plaintiff's suit, which asked the court to find the OPEC nations' sovereign oil-production decisions in violation of the antitrust laws, would require the court to invalidate those sovereign acts:

> While the case is formulated as an anti-trust action, the granting of any relief would in effect amount to an order from a domestic court instructing a foreign sovereign to alter its chosen means of allocating and profiting from its own valuable natural resources.

649 F.2d at 1361.  Thus, "the only remedy sought [was] barred by act of state considerations."  *Id.*  The Fifth Circuit followed suit in *Spectrum Stores*, recognizing that "the granting of any relief . . . would effectively order foreign governments to dismantle their chosen means of exploiting the valuable natural resources within their sovereign territories," and therefore "declin[ing] to sit in judgment of the acts of the foreign states."  632 F.3d at 955–56; *see also World Wide Minerals*, 296 F.3d at 1165 ("Because the relief sought here would require us to question the 'legality' of Kazakhstan's denial of the export license by ruling that

denial a breach of contract, the act of state doctrine applies." (quoting *W.S. Kirkpatrick & Co.*, 493 U.S. at 405)).

Just so here: Each of the five causes of action brought by plaintiffs has at its core ESSA's alleged decision to repudiate *all* of its distribution contracts with other entities and return to distributing salt exclusively through Mitsubishi. In order for the claims to succeed, a court must pass judgment on the lawfulness of that decision, thereby "instructing a foreign sovereign to alter its chosen means of allocating and profiting from its own valuable natural resources." *IAM*, 649 F.2d at 1361. Although the complaint alleges five alternative legal theories, that each seeks the same relief— invalidation of ESSA's exclusivity arrangement with Mitsubishi—is readily illustrated:

- *Count one* alleges a Sherman Act violation on the basis of ESSA and Mitsubishi's "unlawful exclusive contracts, combinations, or conspiracies to prevent their competitors from entering the Mexican solar sea salt market." Relief under this count would require a ruling on the legality of the exclusive distribution scheme for ESSA's salt.

- *Count two* alleges a Clayton Act violation. Although it is brought solely against the Mitsubishi entities, it alleges that "Mitsubishi has forced ESSA to cease sales to non-Mitsubishi entities, and to sell only to Mitsubishi International." Again, what is challenged is ESSA's decision to distribute exclusively through Mitsubishi.

- *Count three* is the California antitrust claim, the heart of which is again that "the Defendants agree[d] that ESSA should not sell salt to any other distributors."

- *Count four* alleges intentional interference with
  contract against all defendants.  The underlying
  theory is that ESSA and Mitsubishi interfered with
  Innofood's contract to sell ESSA-produced salt to
  Sea Breeze by cutting off supply to Innofood.  Again,
  the claim is premised on the allegation that the
  "[d]efendants conspired to have ESSA stop selling
  product to non-Mitsubishi distributors, and actually
  did stop selling salt to Innofood."

- *Count five* alleges intentional interference with
  prospective economic advantage, asserting that
  ESSA and Mitsubishi interfered with plaintiffs'
  future downstream sales of salt by moving to an
  exclusive distribution arrangement.  And once again,
  the claim is founded on "[d]efendants' exclusive
  agreements" and "unlawful actions in restraint of
  trade"—that is, ESSA's decision to distribute
  exclusively through Mitsubishi.

Because each count is premised on ESSA's alleged decision
to repudiate all other contracts and distribute salt exclusively
through Mitsubishi, each count would require a court to pass
on the validity of Mexico's sovereign decisions about how
to exploit and profit from its natural resources.[3]  What's
more, plaintiffs seek injunctive relief, which would amount
to a quite literal instruction to Mexico to alter the way it

---

[3] This observation also disposes of plaintiffs' argument that the
Mitsubishi entities, as private parties, cannot invoke the act of state
doctrine.  As we have previously made clear, "a private litigant *may* raise
the act of state doctrine, even when no sovereign state is a party to the
action." *IAM*, 649 F.2d at 1359 (emphasis added).  That is, "[t]he act of
state doctrine is apposite whenever the federal courts must question the
legality of the sovereign acts of foreign states," even if the entity
invoking the doctrine is not itself sovereign.  *Id.*

profits from its salt.  *See Liu*, 892 F.2d at 1432 ("[A]ny injunctive relief 'instructing a foreign sovereign to alter its chosen means of allocating and profiting from its own valuable natural resources' would affront the sovereignty of a state." (quoting *IAM*, 649 F.2d at 1361)).

## C.  *The Sabbatino Factors*

The Supreme Court has indicated that even when the two mandatory elements are satisfied, courts may appropriately look to additional factors to determine whether application of the act of state doctrine is justified.  *W.S. Kirkpatrick & Co.*, 493 U.S. at 409 ("[I]n *Sabbatino*, . . . we observed that sometimes, even though the validity of the act of a foreign sovereign within its own territory is called into question, the policies underlying the act of state doctrine may not justify its application.").  Here, the additional factors identified by the Court weigh in favor of applying the doctrine.

*Sabbatino* sets out three factors that courts should consider when evaluating whether the act of state doctrine bars an action against a foreign sovereign.  First, "the greater the degree of codification or consensus concerning a particular area of international law, the more appropriate it is for the judiciary to render decisions regarding it." *Sabbatino*, 376 U.S. at 428.  Second, "the less important the implications of an issue are for our foreign relations, the weaker the justification for exclusivity in the political branches."  *Id.*  And finally, "[t]he balance of relevant considerations may also be shifted if the government which perpetuated the challenged act of state is no longer in existence."  *Id.*

With respect to the first factor, we noted in *IAM* that "[w]hile conspiracies in restraint of trade are clearly illegal under domestic law, the record reveals no international

consensus condemning cartels, royalties, and production agreements." 649 F.2d at 1361. Like *IAM*, this case is based on the allegedly anticompetitive acts of a sovereign in the exploitation of its own natural resources; if there is no international consensus condemning such actions, this factor weighs in favor of applying the act of state doctrine. Just as in *IAM*, the record here reveals no international norms against exclusive arrangements in the extraction and export of a country's resources.

Second, this case also has potentially important implications for our foreign relations. *See Sabbatino*, 376 U.S. at 428. As we explained in *IAM*, "the very nature" of an action that, if successful, will result in a United States court telling a foreign sovereign what to do with its own natural resources raises the "possibility of insult to the [foreign] state[] and of interference with the efforts of the political branches to seek favorable relations with" that state. 649 F.2d at 1361. Such an order would be inherently offensive to the principle of co-equality among international sovereigns, *see, e.g.*, *Sarei v. Rio Tinto, PLC*, 550 F.3d 822, 829 (9th Cir. 2008) (en banc), and would therefore be likely to impinge the executive's ability to conduct foreign relations in a coordinated manner.

Moreover, the scale and importance of the resources at issue here are by no means minor. The complaint alleges that ESSA produces nine million tons of sea salt each year— 90 percent of Mexico's salt exports and a full 17 percent of the total global salt output. And because the gravamen of the complaint is that it is unlawful for ESSA to distribute its salt solely through Mitsubishi, the action—and the injunction that a successful suit would bring—implicates *all* of that production, not just the sales contemplated by the Innofood contract.

Finally, to the extent that the complaint alleges improprieties in Mitsubishi's relationship with ESSA, judicial restraint is even more warranted. If it is true that a Japanese corporation has essentially co-opted an instrumentality of the Mexican government through a "combination of legitimate and illegitimate power," a judicial declaration to that effect from a United States court could be fairly regarded as a demeaning affront to Mexico's sovereign control over its own institutions. American intervention in such a delicate matter, if undertaken at all, should proceed through coordinated executive branch action, rather than "piecemeal adjudication" in the courts. *IAM*, 649 F.2d at 1358. The possibility of interference with foreign relations therefore militates against allowing this suit to proceed.

As to the third *Sabbatino* factor, it is undisputed that the government of Mexico continues to exist. Thus, the mandatory elements are satisfied and the prudential concerns counsel in favor of applying the act of state doctrine.

## D. *The Purported Commercial Exception*

In a variation on their argument about the sovereign nature of ESSA's acts, plaintiffs call upon this court to recognize a commercial exception to the act of state doctrine. Such an exception was endorsed by four Justices of the Supreme Court in a 1976 case, but was not adopted as law. *See Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 695–706 (1976) (opinion of White, J.). The *Dunhill* plurality's exception would "[d]istinguish[] between the public and governmental acts of sovereign states on the one hand and their private and commercial acts on the other." *Id.* at 695. Thus, "purely commercial acts" would be excluded from act of state protection; the doctrine would pose no bar to suit when "foreign governments do not

exercise powers peculiar to sovereigns," but instead "exercise only those powers that can also be exercised by private citizens." *Id.* at 704–05.

We appeared to reject a commercial exception several years after *Dunhill*, when we stated that "[t]he act of state doctrine is not diluted by the commercial activity exception which limits the doctrine of sovereign immunity." *IAM*, 649 F.2d at 1360; *see also id.* ("Because the act of state doctrine and the doctrine of sovereign immunity address different concerns and apply in different circumstances, we find that the act of state doctrine remains available when such caution [about affronting foreign sovereigns] is appropriate, regardless of any commercial component of the activity involved."). More recently, however, we have stressed that the existence of a commercial exception is an undecided question. *Von Saher v. Norton Simon Museum of Art at Pasadena*, 754 F.3d 712, 727 (9th Cir. 2014) ("We have not yet decided whether to adopt a commercial exception in our Circuit."); *see also Clayco*, 712 F.2d at 408 (same).

The Fifth and Eleventh Circuits have held that no commercial exception to the act of state doctrine exists, while the D.C. Circuit has arguably adopted the exception. *Compare Spectrum Stores*, 632 F.3d at 955 n.16 ("[W]e agree with the Ninth Circuit that . . . '[t]he act of state doctrine is not diluted by the commercial activity exception which limits the doctrine of sovereign immunity.'" (quoting *IAM*, 649 F.2d at 1360)), *and Honduras Aircraft Registry, Ltd. v. Honduras*, 129 F.3d 543, 550 (11th Cir. 1997) ("[T]here is no commercial exception to the act of state doctrine as there is under the FSIA."), *with de Csepel v. Republic of Hung.*, 714 F.3d 591, 604 (D.C. Cir. 2013) ("[C]laims [that] challenge not sovereign acts, but rather

*commercial* acts [are] entitled to no deference under the act of state doctrine."). The Second, Third, and Sixth Circuits have noted the views expressed by the *Dunhill* plurality, but have found no need to pass upon the existence of a commercial exception. *See Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l B.V.*, 809 F.3d 737, 744 (2d Cir. 2016); *Envtl. Tectonics v. W.S. Kirkpatrick, Inc.*, 847 F.2d 1052, 1059 & n.8 (3d Cir. 1988); *Kalamazoo Spice Extraction Co. v. Provisional Military Gov't of Socialist Eth.*, 729 F.2d 422, 425 n.3 (6th Cir. 1984).

We likewise need not decide whether the act of state doctrine includes a commercial exception, because any such exception would be inapplicable here. As laid out by the *Dunhill* plurality, a commercial exception would apply when "foreign governments do not exercise powers peculiar to sovereigns." *Dunhill*, 425 U.S. at 704. But as explained above, the acts alleged here—decisions about the exploitation and distribution *en masse* of Mexico's sovereign natural resources—are exactly the kind of powers that *are* "peculiar to sovereigns."[4] No private citizen could make the policy decision that substantially all of Mexico's salt production should be distributed through a particular

---

[4] Indeed, it appears possible that any commercial exception is in fact subsumed within the prima facie requirement that the challenged conduct constitute an "official act of a foreign sovereign." *Credit Suisse*, 130 F.3d at 1346 (quoting *W.S. Kirkpatrick & Co.*, 493 U.S. at 405). As we put it in *IAM*, "[w]hile *purely* commercial activity may not rise to the level of an act of state, certain *seemingly* commercial activity will trigger act of state considerations." 649 F.2d at 1360 (emphases added); *see also Honduras Aircraft Registry*, 129 F.3d at 550 ("The factors to be considered, as recited in *Kirkpatrick*, may sometimes overlap with the FSIA commercial exception, but a commercial exception alone is not enough.").

channel.  As in *Clayco*, "[b]ecause the rule espoused by the *Dunhill* plurality would not apply in any event, we need not reach the question whether to adopt an exception to the act of state doctrine for purely commercial activity."  712 F.2d at 408.[5]

## IV.

As a final matter, Mitsubishi argues that Sea Breeze's appeal should be dismissed because its corporate status had been suspended by the California Franchise Tax Board for failure to pay taxes.  However, we have taken judicial notice of the fact that Sea Breeze's status has since been normalized.  Dismissal is not required when a delinquent corporation pays its back taxes and the state restores its corporate powers while its appeal is pending. *Intercontinental Travel Mktg., Inc. v. FDIC*, 45 F.3d 1278, 1282 n.4 (9th Cir. 1994).  Thus, the temporary suspension of Sea Breeze's status does not require dismissal of its appeal.

## V.

In closing, we emphasize the narrow nature of our holding.  This decision is not a license for courts to dismiss cases on act of state grounds whenever a foreign state-owned enterprise is involved.  Nor even is it an invitation to apply the doctrine in every case challenging the actions of a government-owned company that operates in an industry related to natural resources.  We hold merely that on the facts

---

[5] Plaintiffs also make passing reference to the act of state doctrine's so-called extraterritorial exception.  But that exception is implicated when a foreign sovereign attempts to confiscate property that is located within the United States at the time of the confiscation. *See Tchacosh Co., Ltd. v. Rockwell Int'l Corp.*, 766 F.2d 1333, 1336–37 (9th Cir. 1985).  Nothing comparable is alleged here.

of this case—which amount to a challenge to the Mexican government's policy decision about how to dispose of essentially its entire salt output—application of the act of state doctrine is appropriate to preclude our courts' consideration of the action.

**AFFIRMED.**