**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| ROYAL WULFF VENTURES LLC, Lead Plaintiff; ROBERT E. COOK, as Trustee for the Robert E. Cook and Paula J. Brooks Living Trust Under An Agreement Dated 12/30/1998. Lead Plaintiff, *Plaintiffs-Appellants*, v. PRIMERO MINING CORP.; JOSEPH F. CONWAY; DAVID BLAIKLOCK; WENDY KAUFMAN; WADE NESMITH; DAVID DEMERS; GRANT EDEY; BRAD MARCHANT; ROBERT QUARTERMAIN; MICHAEL RILEY; ROHAN HAZELTON; TIMO JAURISTO; EDUARDO LUNA, *Defendants-Appellees.* | No. 17-56367 D.C. No. 2:16-cv-01034-BRO-RAO OPINION |

Appeal from the United States District Court
for the Central District of California
Beverly Reid O'Connell, District Judge, Presiding

Argued and Submitted March 4, 2019
Pasadena, California

Filed September 17, 2019

Before:  Kim McLane Wardlaw and Mark J. Bennett,
Circuit Judges, and William K. Sessions III,[*]
District Judge.

Opinion by Judge Wardlaw;
Dissent by Judge Bennett

## SUMMARY[**]

### Securities Fraud / Act of State Doctrine

The panel affirmed the district court's dismissal of a securities fraud action as barred by the act of state doctrine because plaintiffs' claims under the Securities Exchange Act of 1934 would require a United States court to pass judgment on the validity of a 2012 ruling by the Mexican tax authority.

Plaintiffs alleged that defendants failed to disclose legal deficiencies in the tax ruling and sold shares knowing those deficiencies existed.  After a change in government in Mexico, a challenge to the ruling was filed, but it remained valid under Mexican law.

The act of state doctrine bars suit where there is an official act of a foreign state performed within its own territory and the relief sought or the defenses interposed in the action would require a court in the United States to

---

[*] The Honorable William K. Sessions III, United States District Judge for the District of Vermont, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

declare invalid the foreign sovereign's official act.  The panel held that plaintiffs' claims would require a United States court to determine whether the Mexican tax authority's ruling was properly issued under Mexican law. To determine whether defendants misled investors with an intent to deceive, a court would have to decide whether, and to what extent, the ruling complied with Mexico's Income Tax Law, as well as various other Mexican laws governing the ethical obligations of public servants in Mexico. Agreeing with other circuits, the panel held that the district court was not required to consider other factors, known as the *Sabbatino* factors.  Further, those factors would not have weighed against application of the act of state doctrine.  In sum, the mandatory elements for applying the act of state doctrine were satisfied, and the policies underlying the doctrine weighed in favor of applying it to bar plaintiffs' claims.

Dissenting, Judge Bennett wrote that the majority misapplied the act of state doctrine, and he believed that defendants' statements were materially false or misleading. Judge Bennett wrote that, to find for plaintiffs, a court would only need to determine whether, at the time the defendants made the alleged misrepresentations, they knew that there was a real risk that the Mexican government would nullify the tax ruling—not whether the ruling was actually invalid. Judge Bennett would reverse the district court's rulings that the act of state doctrine barred plaintiffs' action and that plaintiffs failed to adequately plead any materially false or misleading statements.

**COUNSEL**

Richard W. Gonnello (argued), Katherine M. Lenahan, and Megan M. Sullivan, Faruqi & Farugi LLP, New York, New York, for Plaintiffs-Appellants.

Daniel M. Perry (argued) and James D. Whooley, Milbank Tweed Hadley & McCloy LLP, Los Angeles, California, for Defendants-Appellees.

**OPINION**

WARDLAW, Circuit Judge:

We have long recognized that the courts of one country will not sit in judgment of the acts of a foreign sovereign committed within its own territory. The act of state doctrine limits judicial interference in foreign relations by precluding adjudication of the sovereign acts of other nations in United States courts. Because Plaintiffs' claims under the Securities Exchange Act of 1934 would require a United States court to pass judgment on the validity of a 2012 ruling by the United Mexican States' (Mexico) tax authority, the Servicio de Administración Tributaria, they are barred by the act of state doctrine. We therefore affirm the district court's dismissal of Plaintiffs' putative class action complaint.

I.

Plaintiffs Royal Wulff Ventures LLC and Robert E. Cook, as trustee of the Robert E. Cook and Paula J. Brooks Living Trust Under An Agreement Dated 12/30/1988 (collectively Plaintiffs), filed a putative class action in the Central District of California, alleging violations of the Securities Exchange Act of 1934 (Exchange Act) against

Primero Mining Corporation (Primero) and twelve other named defendants.

According to the operative complaint, Primero is a Canadian mining company whose principal asset at the beginning of the class period (October 5, 2012 to February 3, 2016) was the San Dimas gold-silver mine in Tayoltita, Durango, Mexico. The San Dimas mine "has a large silver reserve [that] can be mined at a relatively low cost," and was previously owned and operated by two companies that are not parties to the present action: Wheaton River Minerals Ltd. and Goldcorp Inc. After Primero purchased the San Dimas mine from Goldcorp Inc. in August 2010 for $510 million, Primero's Mexican subsidiary, Primero Empresa Minera, S.A. de C.V. (PEM) owned and operated the San Dimas mine. Primero also acquired a separate subsidiary from Goldcorp Inc., which it renamed Silver Trading Barbados.

In connection with the August 2010 purchase of the San Dimas mine, Primero also assumed the obligations of two separate amended contracts: the Internal Silver Purchase Agreement 2004 (Internal SPA) and External Silver Purchase Agreement 2004 (External SPA). As a result, PEM was contractually bound to sell to Silver Trading Barbados, another Primero subsidiary, "the first 3.5 million ounces per year of silver produced by the San Dimas mine, plus 50% of the excess silver above this amount" at the market rate per ounce of silver (Spot Price) for the first four years after Primero acquired the San Dimas mine. Silver Trading Barbados, in turn, was bound by these contracts to "sell that silver to [unaffiliated Silver Wheaton (Caymans) Ltd.] at the lesser of $4.04 per ounce (adjusted by 1% per year) and Spot Prices." Primero also agreed that after the first four years, it would sell "the first 6 million ounces per year of silver

produced by the San Dimas mine, plus 50% of the excess silver above this amount," to Silver Wheaton (Caymans) Ltd., "at the lesser of $4.20 per ounce (adjusted by 1% per year) and Spot Prices for the life of the mine." During this period, PEM "computed income taxes in Mexico based on selling all silver produced at the San Dimas mine to [Silver Trading Barbados] at Spot Prices as provided in the Internal SPA." Thus, while Primero was required to sell the silver to Silver Wheaton (Caymans) Ltd. at around $4 per ounce, it was required under Mexican law to pay taxes at the significantly higher Spot Prices at which PEM sold the silver to its sister subsidiary. The complaint alleges that Mexico then allowed six transfer pricing methods for transactions with non-resident related parties, which PEM was required to follow with respect to sales by PEM to Silver Trading Barbados under Mexico's Income Tax Law.

During the existence of these contracts the Spot Price per ounce of silver began to rise. At the outset of the agreements, the price was around $6.47 per ounce, but by March 2011, the Spot Price of silver had increased to nearly $35 per ounce. The Internal SPA and External SPA agreements thus led to a significant tax burden for Primero: in the first quarter of 2011, for instance, Primero "recorded a net loss of $7.895 million after paying $12.9 million in income taxes on pre-tax income of just $5.05 million."

Plaintiffs allege that Primero devised a tax evasion scheme to reduce this significant tax liability. This alleged scheme involved two steps. First, Primero restructured its company and amended the Internal SPA "so that the transfer price (*i.e.*, the sale price) from PEM to [its sister subsidiary, Silver Trading Barbados] was no longer the significantly higher Spot Price of silver, but rather the approximately $4 per ounce [unaffiliated Silver Wheaton (Caymans) Ltd.]

Purchase Price." And second, on October 17, 2011, a few days after amending the Internal SPA, Primero submitted an "advance pricing agreement" (APA) application to Mexico's tax authority, the Servicio de Administración Tributaria (SAT), seeking approval of its new transfer pricing methodology resulting from its amendment to the Internal SPA.

According to the operative complaint, an APA is a "prospective agreement regarding the taxpayer's transfer prices" through which "taxpayers [in Mexico can] avoid future disputes over transfer pricing." "APA Rulings are valid for five years, spanning the fiscal year in which they are acquired, the immediately preceding year, and the following three fiscal years." If an APA Ruling is not properly grounded in law or fact, "it can be retroactively annulled by Mexico's Tax Court through a proceeding initiated by the SAT, known as a *juicio de lesividad*."

The operative complaint also alleges that "APAs are handled exclusively by the SAT's Transfer Pricing Audit Administration," and that "[u]nder Mexican law, the head of the Transfer Pricing Audit Administration, known as the Central Administrator for Transfer Pricing Audits, is one of a few people in the Transfer Pricing Administration who may decide [APAs] and in any event is in charge of the remaining few [people] who can [decide APAs]."

As part of Primero's APA application, the company hired an attorney named Christian Natera, whose firm, Natera Consultores, S.C., specialized in transfer pricing. At the time, Christian Natera's brother, Luis Natera, served as the Central Administrator for Transfer Pricing Audits. In this position, Christian Natera's brother was "one of a few people in the Transfer Pricing Administration who [could] decide [APAs] and in any event [was] in charge of the

remaining few [people] who [could decide APAs]." Through its APA application, Primero allegedly sought approval of a transfer pricing methodology known as the "comparable uncontrolled price" or "CUP" method, which would allow it to pay taxes based on the approximately $4 per ounce unaffiliated Silver Wheaton (Caymans) Ltd. Purchase Price for silver extracted from the San Dimas mine, rather than the Spot Price. Plaintiffs allege that the CUP method is one of the six Mexican-approved transfer pricing methods; however, they also contend that Primero's APA, as actually approved, failed to comply with the CUP method.

On October 5, 2012, Primero issued a press release announcing that PEM "ha[d] received a positive ruling from the Mexican tax authorities . . . ." The release described the ruling: "The ruling confirms that [PEM] appropriately records revenue and taxes from sales under the silver purchase agreement at realized prices rather than spot prices effective from August 6, 2010." Thus, under the ruling, the Mexican tax authority allowed PEM to pay taxes based on the Silver Wheaton (Caymans) Ltd. Purchase Price, rather than the Spot Price. According to Plaintiffs, this announcement "shocked the markets," and resulted in Primero's stock increasing by 36%, closing at $7.37 per share that same day.

Following this positive ruling by the SAT, Primero made a number of public statements that Plaintiffs allege were misleading in violation of U.S. securities laws. The first set of statements Plaintiffs identify concerns the effect that the SAT's 2012 APA Ruling would have on Primero's cash flow and tax position. While Plaintiffs catalogue a significant number of these statements by Primero in their complaint, the district court found the following statements representative:

(1) Primero's October 5, 2012 press release: "Primero Mining Corp. . . . announced today that [PEM] has received a positive ruling from the Mexican tax authorities (Servicio de Administracion Tributaria) on its Advance Pricing Agreement ("APA") filing made in October 2011. The ruling confirms that [PEM] appropriately records revenues and taxes from sales under the silver purchase agreement at realized prices rather than spot prices effective from August 6, 2010. Under Mexican tax law, an APA ruling is generally applicable for up to a five year period. For Primero this applies to the fiscal years 2010 to 2014. Assuming the Company continues to sell its silver from its San Dimas mine on the same terms and there are no changes in the application of Mexican tax laws relative to the APA ruling, the Company expects to pay taxes on realized prices for the life of the San Dimas mine."

(2) Defendant Conway: "We had a significant tax burden, which we have just recently got cleared of, but more importantly I think as well now that that is done, what else are we doing?"

(3) Primero's February 13, 2014 Form 6-K: "The Company has taken the position that if the Mexican tax laws relative to the APA ruling do not change and the Company does not change the structure

> of the silver purchase agreement, the
> ability of the Company to continue to pay
> taxes in Mexico based on realized prices
> of silver will continue for the life of the
> San Dimas mine.  Should this judgment
> change, there would be a material change
> in both the income and deferred tax
> position recognized by the Company."

Plaintiffs also allege that Primero made various false and misleading public statements representing that its quarterly and annual financial statements were "prepared in accordance with International Financial Reporting Standards as issued by the International Accounting Standards Board, and reflect management's best estimates and judgment based on information currently available."  In addition to making these statements, Primero allegedly used its newly generated wealth to acquire two companies, Cerro Resources NL and Brigus Gold Corp., selling 41,340,664 of its own shares in the process.

But, according to Plaintiffs, several legal deficiencies in the SAT's 2012 APA Ruling were confirmed after a new government administration came to power in Mexico.  The new government, led by President Enrique Peña Nieto and members of the Institutional Revolutionary Party, began to crack down on suspected tax avoidance schemes.  Plaintiffs allege that by November 2013, Luis Natera had been found administratively liable for failing to recuse himself from Primero's APA application, and was temporarily suspended from working in the public sector.  Plaintiffs also allege that in August 2015, the SAT filed a *juicio de lesividad* against PEM seeking to retroactively nullify the 2012 APA Ruling. When Primero issued a press release in February 2016 announcing that the SAT had served it with a *juicio de*

*lesividad* challenging the 2012 APA Ruling, Primero's shares fell "$0.74 per share, or over 28%, to close at $1.89 per share on February 4, 2016." However, although a *juicio de lesividad* was filed, its contents, and the reasons for which it was filed, are not public. Moreover, Plaintiffs do not contest that the 2012 APA Ruling remains valid under Mexican law.

Although Plaintiffs concede that the contents of the *juicio de lesividad* and the reasons for which it was filed are not public, Plaintiffs allege "[u]pon information and belief . . . that the *juicio de lesividad* was filed for the following reasons: (i) Luis Natera improperly failed to recuse himself from Primero's APA application given that his brother, Christian Natera, was an authorized representative of [Primero;] (ii) the APA Ruling approved a transfer pricing methodology other than the CUP methodologies that were proposed by Primero[;] (iii) the APA Ruling did not conduct the requisite comparison of the factors set forth in Article 215 of [Mexico's Income Tax Law] that are used to determine whether a transaction complies with the [arms length principle;] and (iv) Primero's proposed CUP methodologies were flawed anyway because the transaction that Primero attempted to use as its comparable independent transaction . . . was actually a related party transaction and was therefore an inappropriate comparison transaction . . . ."

Plaintiffs allege that in failing to disclose these alleged legal deficiencies in the 2012 APA Ruling, and in selling Primero shares knowing these legal deficiencies existed, Primero violated Rule 10b-5 and sections 10(b), 20A of the Exchange Act. Plaintiffs also allege violations of Rule 10b-5 and sections 10(b), 20(a) of the Exchange Act against various "Officer Defendants," as well as violations of

section 20(a) of the Exchange Act against various "Director Defendants" and Defendant Joseph Conway.

Primero moved to dismiss the Plaintiffs' complaint based on the act of state doctrine and failure to state a claim. The district court dismissed the action as barred by the act of state doctrine, and ruled in the alternative that Plaintiffs had failed to adequately plead any materially false or misleading statements.  Plaintiffs timely appeal.

## II.

"[W]e review the district court's decision concerning the act of state doctrine de novo."  *Liu v. Republic of China*, 892 F.2d 1419, 1424 (9th Cir. 1989).  "When the doctrine is raised on a motion to dismiss, we take the allegations in the complaint as true and view them in the light most favorable to the plaintiffs."  *Sea Breeze Salt, Inc. v. Mitsubishi Corp.*, 899 F.3d 1064, 1068 (9th Cir. 2018) (citing *Clayco Petroleum Corp. v. Occidental Petroleum Corp.*, 712 F.2d 404, 406 (9th Cir. 1983) (per curiam)).

## III.

While the act of state doctrine was once viewed as "an expression of international law, resting upon 'the highest considerations of international comity and expediency,'" *W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l*, 493 U.S. 400, 404 (1990) (quoting *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 303–04 (1918)), we have come to view the doctrine "as a consequence of domestic separation of powers, reflecting 'the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder' the conduct of foreign affairs," *id.* (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 423 (1964)).

"As a doctrinal matter, the 'classic statement' of the act of state doctrine is that '[e]very sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory.'" *Sea Breeze Salt*, 899 F.3d at 1069 (quoting *Credit Suisse v. U.S. Dist. Court for Cent. Dist. of Cal.*, 130 F.3d 1342, 1346 (9th Cir. 1997)).  "In its modern formulation, the doctrine bars suit where '(1) there is an official act of a foreign sovereign performed within its own territory; and (2) the relief sought or the defense interposed [in the action would require] a court in the United States to declare invalid the [foreign sovereign's] official act.'"  *Id.* (alterations in original) (quoting *Credit Suisse*, 130 F.3d at 1346).  "[E]ven when [these] two mandatory elements are satisfied, courts may appropriately look to additional factors [*i.e.*, the policies underlying the act of state doctrine] to determine whether application of the act of state doctrine is justified."  *Id.* at 1072–73 (citing *W.S. Kirkpatrick*, 493 U.S. at 409).

A.  *Invalidation of an Official Act of a Foreign Sovereign*

The district court correctly held that all of Plaintiffs' Exchange Act claims are barred by the act of state doctrine because they would require a United States court to determine whether the Mexican tax authority's 2012 APA Ruling was properly issued under Mexican law.  Plaintiffs do not challenge the conclusion that the 2012 APA Ruling issued by Mexico's tax authority constitutes a "public and governmental act[] of [a] sovereign state," taken within its own territory, *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 695 (1976) (plurality opinion), but instead argue that the act of state doctrine applies only where United States courts would be required to declare the foreign

government's action "null and void," not unlawful in any other way. But our precedent dictates otherwise. We have long recognized that the act of state doctrine applies where resolution of a plaintiff's claims would require a court to evaluate a foreign sovereign's compliance with its own laws. *See West v. Multibanco Comermex, S.A.*, 807 F.2d 820, 828 (9th Cir. 1987) ("The evaluation by one sovereign of foreign officers' compliance with their own laws would, at least in the absence of the foreign sovereign's consent, intrude upon that state's coequal status.").

In *Kirkpatrick*, the Supreme Court rejected application of the act of state doctrine because "the factual predicate for application . . . d[id] not exist." 493 U.S. at 405. It went on to state: "Nothing in the present suit requires the Court to declare invalid, and thus ineffective . . . the official act of a foreign sovereign." *Id.* (citation omitted). The Court further reasoned that "[a]ct of state issues only arise when a court *must decide*—that is, when the outcome of the case turns upon—the effect of official action by a foreign sovereign." *Id.* at 406; *see also Sabbatino*, 376 U.S. at 415 n.17 ("An inquiry by United States courts into the validity of an act of an official of a foreign state under the law of that state would not only be exceedingly difficult but, if wrongly made, would be likely to be highly offensive to the state in question.").

Plaintiffs rely on *Kirkpatrick* to support their argument that the act of state doctrine is inapplicable here because their claims do not require United States courts to decide whether the Mexican tax authority's 2012 APA Ruling was valid. In *Kirkpatrick*, plaintiffs brought federal and state civil RICO claims, as well as claims under the Robinson-Patman Act of 1936, 15 U.S.C. § 13, against a competitor which allegedly paid bribes to Nigerian officials in order to obtain a contract

from the Nigerian government.  493 U.S. at 401–04.  The *Kirkpatrick* defendants argued that the facts required to demonstrate they paid bribes to Nigerian officials to obtain contracts would also demonstrate that the contracts violated Nigerian law.  *Id.* at 406.  The Court disagreed, holding that "[r]egardless of what the court's factual findings may suggest as to the legality of the Nigerian contract, its legality is simply not a question to be decided in the present suit, and there is thus no occasion to apply the rule of decision that the act of state doctrine requires."  *Id.*  The Court cited *Sharon v. Time, Inc.*, 599 F. Supp. 538, 546 (S.D.N.Y. 1984), to emphasize that "[t]he issue in this litigation is not whether [the alleged] acts are valid, but whether they occurred."  *See W.S. Kirkpatrick*, 493 U.S. at 406.

Here, unlike in *Kirkpatrick*, to conclude that Primero misled investors, a court *must decide* whether, and to what extent, the 2012 APA Ruling complies with Mexico's Income Tax Law, as well as various other Mexican laws governing the ethical obligations of public servants in Mexico.  Here, it is not simply a question of whether a given act—in *Kirkpatrick* a bribe—occurred; the questions Plaintiffs raise are as to the legality of the 2012 APA Ruling itself, and what defendants knew about its validity or not.

To prevail on their securities fraud claims under section 10(b) and Rule 10b-5, Plaintiffs must show (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.  *See Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 603 (9th Cir. 2014) (citing *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).  "[S]cienter refers to 'a mental state embracing intent to deceive, manipulate, or defraud,'"

*Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 648 (2010) (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n.12 (1976)), and may also refer to deliberate recklessness, "a form of intentional or knowing misconduct." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009) (citation omitted). Plaintiffs accordingly must show that Primero "made a material misstatement *with an intent to deceive*—not merely innocently or negligently." *Merck & Co.*, 559 U.S. at 648–49 (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007)). Plaintiffs' claims under sections 20A, 20(a) of the Exchange Act, in turn, depend on predicate violations of either section 10(b) or Rule 10b-5. *See In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 710–11 (9th Cir. 2012) ("To prevail on its claims for violations of § 20A, [Plaintiff] must first sufficiently allege a violation of § 10(b) or Rule 10b-5." (citing *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035 n.15 (9th Cir. 2002))); *see also Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009) ("Section 20(a) claims may be dismissed summarily . . . if a plaintiff fails to adequately plead a primary violation of section 10(b)."). In total, Plaintiffs identify two categories of allegedly materially misleading statements: (1) statements about the 2012 APA Ruling and its impact on Primero's finances; and (2) statements that Primero's quarterly and annual statements were prepared in accordance with International Financial Reporting Standards. Plaintiffs allege that in making both categories of statements, defendants knowingly failed to disclose legal deficiencies under Mexican tax law in the 2012 APA Ruling that could render it vulnerable to non-renewal or *nullification*. The logic is compelling: United States courts would be required to decide whether there were in fact legal deficiencies under Mexican law that would nullify the APA Ruling—in other words invalidate it—that could be known and were known

as such to defendants when they made their public statements. By contrast, in *Kirkpatrick*, United States courts were not called upon to decide whether the Nigerian contract was legally deficient under Nigerian law due to the bribes; all they were asked to decide is whether bribes were made.[1]

As Plaintiffs also acknowledge, the 2012 APA Ruling that they contend is so legally flawed as to render Primero's statements about it misleading, remains lawful and valid under Mexican law. And although Plaintiffs allege that the Mexican government has filed a *juicio de lesividad* to nullify the 2012 APA Ruling, according to the complaint those proceedings are ongoing, and there are no allegations that the Mexican government has ruled on its *juicio de lesividad*.

Under these circumstances, allowing Plaintiffs' Exchange Act claims to proceed would require "[t]he evaluation by one sovereign of foreign officers' compliance with their own laws . . . in the absence of the foreign sovereign's consent," because "[t]he acts or omissions of the sovereign," and the compliance of Mexican officials with Mexican law "is the determinative issue on [Plaintiffs'] claim[s]." *West*, 807 F.2d at 828. For instance, Plaintiffs allege that the 2012 APA Ruling was vulnerable to legal

---

[1] The dissent seems to misapprehend this aspect of a section 10(b) and Rule 10b-5 claim. To prevail, Plaintiffs must demonstrate an intentional or knowing material misleading fact or omission. *See Merck & Co.*, 559 U.S. at 648–49. The only way Primero's statements were knowingly or intentionally misleading is if the alleged unethical behavior of a Mexican official rendered Mexico's 2012 APA Ruling invalid. Even taking Plaintiffs' allegations as true, and assuming that Luis Natera acted unethically, Plaintiffs still must prove both that this conduct invalidated the 2012 APA Ruling under Mexican law as a result and that Primero knew that the APA Ruling was so invalidated at the time of its statements.

challenge, and could therefore be nullified, under two separate articles of Mexico's Income Tax Law, as well as at least two other articles of Mexico's conflict of interest laws. But for a court to credit Plaintiffs' theories, and conclude that Primero knowingly failed to disclose these alleged material legal deficiencies, that court will necessarily be required to determine whether those alleged deficiencies were in fact present in the APA proceedings, should have led the Mexican tax authority to disapprove the APA in the first place, or resulted in an APA Ruling that was subject to nullification. This sort of review of a foreign government's decision is precisely what the act of state doctrine precludes. Because Plaintiffs' Exchange Act claims would require a court to evaluate Mexico's tax authority's compliance with Mexican law, their claims would require "a court in the United States to declare invalid the official act of a foreign sovereign performed within its own territory." *W.S. Kirkpatrick*, 493 U.S. at 405. The second element for application of the act of state doctrine is therefore met.[2]

---

[2] While the dissent focuses extensively on the history of the Supreme Court's act of state doctrine jurisprudence, it fails to engage in the doctrinal analysis required in this case. As we have previously recognized, the act of state doctrine bars suit where "(1) there is an official act of a foreign sovereign performed within its own territory; and (2) the relief sought or the defense interposed [in the action] would require a court in the United States to declare invalid the [foreign sovereign's] official act." *Sea Breeze Salt*, 899 F.3d at 1069 (alterations in original) (citation omitted). Here, applying our precedent, we hold that the second element of the act of state doctrine is satisfied where the validity of a public and governmental act—Mexico's 2012 APA Ruling—under Mexico's own, myriad applicable laws is outcome-determinative of Plaintiffs' claims. *See West*, 807 F.2d at 828. This holding is squarely consistent with *W.S. Kirkpatrick*, which affirmed, rather than reversed, the principle acknowledged in *West* that the act of state doctrine applies where a court must decide the legality of a foreign

## B.  *The Sabbatino Factors*

In *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964), the Supreme Court acknowledged three factors for courts to consider to ensure that application of the act of state doctrine "reflect[s] the proper distribution of functions between the judicial and political branches of the Government on matters bearing upon foreign affairs." 376 U.S. at 427–28.   First, "the greater the degree of codification or consensus concerning a particular area of international law, the more appropriate it is for the judiciary to render decisions regarding it . . . ."  *Id.* at 428.  Second, "the less important the implications of an issue are for our foreign relations, the weaker the justification for exclusivity in the political branches."  *Id.*  And finally, "[t]he balance of relevant considerations may also be shifted if the government which perpetrated the challenged act of state is no longer in existence . . . ."  *Id.*  As the Court later stated,

---

sovereign's actions under that sovereign's laws.  *See W.S. Kirkpatrick*, 493 U.S. at 406.

The dissent further asserts that Plaintiffs' Exchange Act claims do not require us to determine the legality of the 2012 APA Ruling.  *See, e.g.*, Dissent at 34 ("Plaintiffs need not show . . . that the 2012 APA Ruling was illegal or invalid.").  But in order for us to determine whether or not Defendants' statements or omissions about the legal validity of the 2012 APA Ruling were materially false or misleading, we must necessarily determine in the first instance (1) whether the 2012 APA Ruling did in fact suffer from legal defects under Mexican law, and (2) whether Defendants' statements or omissions accurately reflected those purported legal defects under Mexican law.  Despite its exhaustive review, the dissent fails to explain how Plaintiffs' claims can be resolved without first determining whether the 2012 APA Ruling suffered from legal deficiencies under Mexican law, and similarly fails to show how the second element of the act of state doctrine is not met where a foreign sovereign's compliance with its own laws is the *determinative* issue on Plaintiffs' claims, as here.

"in *Sabbatino* . . . we observed that sometimes, even though the validity of the act of a foreign sovereign within its own territory is called into question, the policies underlying the act of state doctrine may not justify its application." *W.S. Kirkpatrick*, 493 U.S. at 409.

Plaintiffs contend that the district court erred by failing to conduct an analysis of the *Sabbatino* factors.  But neither our circuit nor the Supreme Court has required explicit consideration of the *Sabbatino* factors in properly applying the act of state doctrine.  *See Sea Breeze Salt*, 899 F.3d at 1072–73 ("[E]ven when the two mandatory elements are satisfied, courts *may* appropriately look to additional factors to determine whether application of the act of state doctrine is justified." (emphasis added) (citing *W.S. Kirkpatrick*, 493 U.S. at 409)).  This accords with the approach taken by our sister circuits.  *See, e.g.*, *Konowaloff v. Metro. Museum of Art*, 702 F.3d 140, 146 (2d Cir. 2012) ("[A] court may properly grant a motion to dismiss on the basis of [the act of state doctrine] when its applicability is shown on the face of the complaint."), *cert. denied*, 570 U.S. 906 (2013); *see also World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1164–67 (D.C. Cir. 2002) (affirming the district court's dismissal under the act of state doctrine where the district court did not address the *Sabbatino* factors, but the case was "plainly [one] in which the policies underlying the doctrine 'justify its application'" (quoting *W.S. Kirkpatrick*, 493 U.S. at 409)), *cert. denied*, 537 U.S. 1187 (2003).  Because this is a case in which the policies underlying the act of state doctrine justify its application, the district court did not err in declining to specifically address each *Sabbatino* factor.  And even if the district court had gone on to address those factors, they would not have weighed against applying the act of state doctrine.

With respect to "the degree of codification or consensus concerning a particular area of international law," *Sabbatino*, 376 U.S. at 428, Plaintiffs argue that there is a high degree of international consensus as to the appropriate use of the arm's length principle for transfer pricing methodologies, rendering review of the 2012 APA Ruling appropriate.  While Plaintiffs cite to guidelines on transfer pricing published by the Organisation for Economic Co-operation and Development (OECD) in support of their claim of international consensus on the arm's length principle, these guidelines do not affect the issue underlying Plaintiffs' claims: that resolving their claims would require a court to determine whether the Mexican government violated its own tax laws in issuing the 2012 APA Ruling. Plaintiffs' assertion that the 2012 APA Ruling failed to comply with the arm's length principle is simply a rephrasing of their assertion that the 2012 APA Ruling failed to comply with Mexico's Income Tax Law.  The SAT, in its ruling, approved of a transfer pricing methodology for PEM, concluding that this methodology complied with Article 215 of Mexico's Income Tax Law.  Article 215, according to Plaintiffs, "sets forth the [arm's length principle], providing that corporate taxpayers dealing with foreign related parties are required to determine their gross income and allowable deductions by using the prices and consideration that would have been used with or between independent parties in comparable transactions."  As such, guidelines published by the OECD as to the appropriate use of the arm's length principle have no effect on the requirement inherent in Plaintiffs' claims that a court in the United States reevaluate the Mexican government's compliance with its own tax laws.  Because of this, the degree of international consensus as to the arm's length principle does not affect our conclusion that the act of state doctrine applies.

Second, Plaintiffs' claims carry significant implications for U.S. foreign relations because the subject of the 2012 APA Ruling is how Mexico taxes transfers of silver, a natural resource extracted in Mexico.  We have repeatedly recognized that where an action challenges a foreign sovereign's decisions about how to exploit its own natural resources, that action "would be inherently offensive to the principle of co-equality among international sovereigns[.]" *Sea Breeze Salt*, 899 F.3d at 1073; *see also Int'l Ass'n of Machinists and Aerospace Workers*, *(IAM) v. OPEC*, 649 F.2d 1354, 1361 (9th Cir. 1981) ("[T]he granting of any relief would in effect amount to an order from a domestic court instructing a foreign sovereign to alter its chosen means of allocating and profiting from its own valuable natural resources.").  Here, were a United States court to review the 2012 APA Ruling, and attempt to determine whether the 2012 APA Ruling complied with Mexico's tax laws, it would be instructing a foreign sovereign both on how it should tax and regulate silver extracted in Mexico, and on how to do so in compliance with the foreign sovereign's own laws.  The "very nature" of that action would raise "[t]he possibility of insult to the [Mexican government] and of interference with the efforts of the political branches to seek favorable relations with [the Mexican government]," directly supporting application of the act of state doctrine. *IAM*, 649 F.2d at 1361; *see also Sabbatino*, 376 U.S. at 415 n.17 ("An inquiry by United States courts into the validity of an act of an official of a foreign state under the law of that state . . . if wrongly made[] would be likely to be highly offensive to the state in question.").

Third, as to whether "[t]he balance of relevant considerations may . . . be shifted if the government which perpetuated the challenged act of state is no longer in existence," *Sabbatino*, 376 U.S. at 428,  Plaintiffs argue that

a change in presidential administrations since the 2012 APA Ruling issued counsels against applying the doctrine. But a change in presidential administrations and policies does not mean that the government is no longer in existence, and Plaintiffs cite no authority suggesting that a mere change in presidential administrations satisfies the third *Sabbatino* factor. Here, the challenged act of state, the government, and the institution that took the challenged act, the SAT, remain intact. *Cf. Sea Breeze Salt*, 899 F.3d at 1074 ("[I]t is undisputed that the government of Mexico continues to exist."). Furthermore, Plaintiffs' complaint alleges that the new administration has initiated proceedings to resolve the same issues at the heart of their claims: whether, and to what extent, the 2012 APA Ruling complied with Mexico's tax laws. That inquiry counsels against the courts of a foreign nation interfering with Mexico's sovereign interest in determining the SAT's compliance with Mexican tax law. Therefore, the change in presidential administrations Plaintiffs identify does not weigh against applying the act of state doctrine.

Finally, Plaintiffs argue that the district court erred in failing to consider whether the challenged act of state was in the public interest. While we have recognized in other contexts that "[o]ne factor we must consider [in deciding whether to apply the act of state doctrine] is whether the foreign state was acting in the public interest," *Liu*, 892 F.2d at 1432, we have not mandated that courts consider the public interest in determining whether the act of state doctrine applies. *See, e.g.*, *Credit Suisse*, 130 F.3d at 1346–48 (applying act of state doctrine without considering whether a foreign sovereign's actions were taken in its public's interest); *see also Sea Breeze Salt*, 899 F.3d at 1068–74 (same). Plaintiffs' argument is that we should decline to apply the act of state doctrine because Luis

Natera's issuance of the 2012 APA Ruling was not in the public interest, because "it violated Mexican law . . . and deprived Mexico of legitimate tax revenue that could have been used for its populace."  But to deem those considerations as precluding application of the act of state doctrine would turn the doctrine on its head.  These are precisely the types of domestic issues that Mexico should be able to resolve without interference by foreign courts.  Thus, whether the 2012 APA Ruling advanced Mexico's public interest does not counsel against applying the act of state doctrine in this case.

In sum, the mandatory elements for applying the act of state doctrine are satisfied, and the policies underlying the doctrine weigh in favor of applying it to bar Plaintiffs' claims.[3]

## IV.

For the foregoing reasons, we affirm the district court's dismissal under the act of state doctrine, and decline to reconsider whether a tax ruling by the Mexican government, that remains valid in Mexico, complied with Mexico's tax laws.

**AFFIRMED.**

---

[3] Because we conclude that the act of state doctrine applies to bar all of Plaintiffs' claims, we need not consider whether the district court correctly dismissed this action on the alternative ground that Plaintiffs failed to adequately plead any materially false or misleading statements.

BENNETT, Circuit Judge, dissenting:

"In every case in which we have held the act of state doctrine applicable, the relief sought or the defense interposed would have required a court in the United States to declare invalid the official act of a foreign sovereign performed within its own territory." *W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l*, 493 U.S. 400, 405 (1990). At issue here is whether Defendants knowingly made materially false or misleading statements, including non-disclosure of material information. Contrary to the majority's assertion, the validity of the 2012 APA Ruling (the "Ruling") is not at issue; Plaintiffs hardly need to ask this court to invalidate the Ruling—the Mexican government is doing that already.

But, to be clear, Plaintiffs have not sought a determination that the APA Ruling is invalid, and such a determination is unnecessary for them to prevail. To find for Plaintiffs, a court would only need to determine whether, at the time the Defendants made the alleged misrepresentations, they knew that there was a real risk that the Mexican government would nullify the Ruling—not whether the Ruling was actually invalid.

Because the majority's opinion misapplies the act of state doctrine, and because I believe that Defendants' statements were materially false or misleading, I respectfully dissent.

## I.

The linchpin of the act of state doctrine has always been an unwillingness to countermand the act of a foreign sovereign. *See Blad v. Bamfield*, 36 Eng. Rep. 992, 993 (Ch. 1674) (refusing to reverse Danish seizure of an English ship). The doctrine originated in Seventeenth Century

England as an extension of sovereign immunity for officials acting on the sovereign's behalf. Michael J. Bazyler, *Abolishing the Act of State Doctrine*, 134 U. Pa. L. Rev. 325, 330 n.23 (1986) (recognizing *Blad v. Bamfield* as the common law origin of the act of state doctrine); *see also, e.g.*, *Nabab of Arcot v. East India Co.*, (1793) 4 Brown Ch. 181 (holding that the East India Company could not be sued because it acted with sovereign authority).

The Supreme Court first recognized the doctrine in *The Schooner Exchange v. McFaddon*, 11 U.S. 116, 122 (1812), in which the Court refused to set aside the French seizure of a ship on the orders of Napoleon: "We do not justify that decree, but we say that whenever the act is done by a sovereign in his sovereign character, it becomes a matter of negotiation, or of reprisals, or of war, according to its importance." Following *The Schooner Exchange*, the Court built upon this sovereign immunity corollary in cases involving property disputes arising from sovereign actions during times of war. *See, e.g.*, *United States v. Rice*, 17 U.S. 246 (1819) (holding that no taxes due on goods imported by the British during the War of 1812); *Williams v. Bruffy*, 96 U.S. 176 (1877) (refusing to uphold Confederate States' sequestration of debts to Union loyalists as the act of an independent nation).

In 1897, the Supreme Court formally articulated the act of state doctrine: "Every sovereign state is bound to respect the independence of every other sovereign state, and the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory." *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897). The Court dismissed tort claims for false imprisonment by a Venezuelan general during an 1892 revolution, finding that "[t]he acts complained of were the acts of a military

commander representing the authority of the revolutionary party as a government, which afterwards succeeded, and was recognized by the United States." *Id.* at 254.

Since *Underhill*, the Supreme Court has applied the act of state doctrine in only two situations: 1) actions seeking to reverse a foreign land grant, *Shapleigh v. Mier*, 299 U.S. 468, 471 (1937); and 2) actions seeking to reverse a sovereign seizure of property, *Oetjen v. Cent. Leather Co.*, 246 U.S. 297 (1918) (Mexican general's seizure of goods during revolution); *Ricaud v. Am. Metal Co.*, 246 U.S. 304 (1918) (same); *United States v. Belmont*, 301 U.S. 324 (1937) (Soviet nationalization of property); *United States v. Pink*, 315 U.S. 203 (1942) (same); *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964) (Cuban expropriation decree).[1] In all of these cases, plaintiffs asked the Court to set aside the acts of foreign sovereigns, and in all, the Court refused.

*Oetjen* and *Ricaud*, companion cases, involved the seizure of property by Mexican generals during a revolution. In each, a general seized property for the war effort and then sold it to American third parties who re-sold it in turn. Plaintiffs sued the new owners, claiming title and asking the Court to invalidate the sales. The Court refused, invoking the act of state doctrine: "[W]e have a duly commissioned military commander of what must be accepted as the legitimate government of Mexico, in the progress of a revolution, and when conducting active independent operations, seizing and selling in Mexico, as a military

---

[1] That nearly all the Supreme Court cases applying the act of state doctrine involved seizures of property—sovereign acts far different from those involved here—should have given the majority immediate pause. It didn't.

contribution, the property in controversy, at the time owned and in the possession of a citizen of Mexico." *Oetjen*, 246 U.S. at 303.

In 1937, the Court similarly refused to invalidate a Mexican land grant, holding that "the [Mexican] expropriation decree, if lawful and effective under the Constitution and laws of Mexico, must be recognized as lawful and effective under the laws of the United States, the sovereignty of Mexico at the time of that decree being exclusive of any other." *Shapleigh*, 299 U.S. at 471. The Court examined the validity of the expropriation decree under Mexican law when it was granted: "What concerns us here and now is the efficacy of the decree under the land law of Mexico at the date of its proclamation to extinguish hostile claims of ownership and pass the title to another." *Id.* The Court discussed evidence on Mexican law from "[e]xperts testifying . . . [as to the] the Constitution of the Federal Republic (Constitution of Mexico, 1917, Art. 27), and . . . the Agrarian Law of the State of Chihuahua," *id.* at 473, as well as "[o]pinions of the Supreme Court of Mexico," *id.* at 474.[2] The Court found the expropriation decree validly extinguished competing claims under Mexican law when it was made and thus was "proof against assault." *Id.* at 473.

The last time the Court invoked the act of state doctrine was more than fifty years ago, in *Sabbatino*, when it refused to reverse a Cuban expropriation decree. The Court limited

---

[2] Here, as in *Shapleigh*, the district court may have needed to hear expert testimony about the laws of Mexico (in accord with Rule 44.1 of the Federal Rules of Civil Procedure). But taking that testimony to determine whether there were false or misleading statements is a far cry from adjudicating the acts of a foreign sovereign.

its holding to property: "[R]ather than laying down or reaffirming an inflexible and all-encompassing rule in this case, we decide only that the [Judicial Branch] will not examine the validity of a taking of property within its own territory by a foreign sovereign government, extant and recognized by this country at the time of suit[.]" 376 U.S. at 428. Congress disagreed and less than a year later declared that seizure of property in violation of international law does not implicate the act of state doctrine. Foreign Assistance Act of 1964 (Second Hickenlooper Amendment), Pub. L. No. 88-633, 77 Stat. 386 (current version at 22 U.S.C. § 2370(e)(2)).

*Sabbatino* established three principles for the modern act of state doctrine. First, the doctrine is a "principle of decision." 376 U.S. at 427. Second, it has constitutional underpinnings based on institutional competency but neither the Constitution nor international law mandate it. *Id.* at 423. And third, applying the doctrine requires a balancing test because "the less important the implications of an issue are for our foreign relations, the weaker the justification for exclusivity in the political branches." *Id.* at 428.

Since the 1960s, the Court has consistently found the act of state doctrine inapplicable, either because the policies underlying the act do not justify its application, *First Nat. City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 769–70 (1972) (plurality op.) (finding act of state doctrine did not bar counterclaim against Cuba where the Department of State advised the Court the doctrine need not be applied), because no state act occurred, *Alfred Dunhill v. Republic of Cuba*, 425 U.S. 682 (1976) (plurality op.) (suggesting there may be a commercial exception to the doctrine), or because undermining a foreign act did not require the court to invalidate it, *W.S. Kirkpatrick*, 493 U.S. at 409.

"The act of state doctrine is not some vague doctrine of abstention but a *principle of decision*." *Id.* at 406 (quoting *Sabbatino*, 376 U.S. at 427) (emphasis in *W.S. Kirkpatrick*). In *W.S. Kirkpatrick*, the plaintiff brought state and federal RICO claims alleging that the defendants bribed Nigerian officials to obtain a lucrative government contract. A unanimous Supreme Court held that litigating the Nigerian officials' misconduct could not trigger the act of state doctrine, even though such misconduct could invalidate the award of the state contract under Nigerian law. *Id.* at 406 (explaining that the doctrine did not apply even if "factual findings . . . may cast doubt upon the validity of foreign sovereign acts").

Before 1991, lower courts had been applying the act of state doctrine any time an inquiry would "impugn or question the nobility of a foreign nation's motivation." *Clayco Petroleum Corp. v. Occidental Petroleum Corp.*, 712 F.2d 404, 407 (9th Cir. 1983). The facts of *Clayco* were nearly identical to those in *W.S. Kirkpatrick*—plaintiffs claimed that defendants paid bribes to foreign officials to secure "valuable off-shore oil concession[s]." *Clayco*, 712 F.2d at 405. Since "the very existence of plaintiffs' claim depend[ed] upon establishing that the motivation for the sovereign act was bribery," we dismissed the case. *Id.* at 407. Following that principle, a few years later we established that "[t]he evaluation by one sovereign of foreign officers' compliance with their own laws would, at least in the absence of the foreign sovereign's consent, intrude upon that state's coequal status." *West v. Multibanco Comermex, S.A.*, 807 F.2d 820, 828 (9th Cir. 1987) (citing *e.g.*, *Clayco*, 712 F.2d at 406–407). The majority relies on this interpretation of the act of state doctrine. Maj. op. at 18.

The district court in *W.S. Kirkpatrick* relied on this same interpretation, citing *Clayco* when it dismissed the plaintiff's claims. *Envtl. Tectonics Corp. v. W.S. Kirkpatrick & Co., Inc.* (*Kirkpatrick District Court Decision*), 659 F. Supp. 1381, 1393 (D.N.J. 1987). The district court determined that it could not inquire into the "validity of an act by a foreign government." *Id.* at 1392. Thus, plaintiff's case was barred because "an indispensable ingredient of [plaintiff's] cause of action requires establishing the involvement of the Government of Nigeria, its officials or representatives in corrupt activities which violate Nigerian law." *Id.* at 1394.

When it took up *W.S. Kirkpatrick*, the Supreme Court directly overruled this interpretation of the act of state doctrine: "[It] does not establish an exception for cases and controversies that may embarrass foreign governments, but merely requires that, in the process of deciding, the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid." 493 U.S. at 409. Undermining the validity of a state act (bribery was illegal in Nigeria) differs from invalidating it: "Neither the claim nor any asserted defense requires a determination that Nigeria's contract with Kirkpatrick International was, or was not, effective . . . [r]egardless of what the court's factual findings may *suggest* as to the legality of the Nigerian contract." *Id.* at 406 (emphasis added). That holding should end the analysis here. Plaintiffs' claims are based on alleged materially false and misleading statements. If Plaintiffs are correct, the ultimate factual findings may imply that Defendants improperly obtained the APA Ruling, which was subject, ab initio, to challenge and ultimate retraction (*nunc pro tunc* or otherwise). But to paraphrase *W.S. Kirkpatrick*, neither the claim nor any asserted defense requires a determination that the APA Ruling was or was not effective, no matter what the court's factual findings may *suggest* about the legality of the

APA Ruling or Defendants' efforts to obtain it. After *W.S. Kirkpatrick*, the majority's holding that the act of state doctrine bars any inquiry into "foreign officers' compliance with their own laws," Maj. op. at 14, simply isn't supportable.

In each of the very few Supreme Court cases invoking the doctrine, a sovereign allegedly caused the injury (seizure/expropriation of property), and the requested remedy required the court to set that act aside. The same has been true in this circuit, except for the *Clayco* and *Multibanco* line of cases overruled in *W.S. Kirkpatrick*. For example, in *Credit Suisse v. U.S. District Court for the Central District of California*, 130 F.3d 1342, 1347 (9th Cir. 1997), the plaintiff requested injunctive and declaratory relief, which would have required the court to override Swiss Executive Orders. In *International Association of Machinists & Aerospace Workers (IAM) v. Organization of Petroleum Exporting Countries (OPEC)*, 649 F.2d 1354, 1355 (9th Cir. 1981), plaintiffs sought injunctive relief and damages against the OPEC countries—"The possibility of insult to the OPEC states and of interference with the efforts of the political branches to seek favorable relations with them is apparent from the very nature of this action and the remedy sought." *Id.* at 1361. Most recently, in *Sea Breeze Salt, Inc. v. Mitsubishi Corp.*, 899 F.3d 1064, 1071 (9th Cir. 2018), the plaintiffs sought injunctive relief against Mexico[3] for alleged anticompetitive acts: "[A]ny relief would in

---

[3] We found that the alleged anti-competitive acts were "acts of the Mexican government" because the government owned a majority of the defendant corporation, appointed the majority of the company's board of directors and Director General (the CEO), and under Mexico's Constitution, had exclusive authority to distribute the country's natural resources, including by establishing companies to do so. *Sea Breeze Salt*, 899 F.3d at 1069–70.

effect amount to an order from a domestic court instructing a foreign sovereign to alter its chosen means of allocating and profiting from its own valuable natural resources."

Here, by contrast, Plaintiffs have not alleged an injury caused by the Mexican government—they have alleged injury caused by false or misleading statements and material omissions. Plaintiffs do not seek to set aside the 2012 APA Ruling—they want money damages from a private company and its officers and directors. Nothing in Plaintiffs' requested remedy would require the court to set aside or invalidate Mexico's APA Ruling. Thus, the act of state doctrine, as clearly defined (and limited) by the Supreme Court, does not bar Plaintiffs' claims.

## II.

The majority believes the validity of the APA Ruling is at stake because "a foreign sovereign's compliance with its own laws is the *determinative* issue on Plaintiffs' claims[.]" Maj. op. at 18 n.2. The same could be said of *W.S. Kirkpatrick*.

The majority contends that "[h]ere, it is not simply a question of whether a given act—in *Kirkpatrick* a bribe—occurred; the questions Plaintiffs raise are as to the legality of the 2012 APA Ruling itself, and what defendants knew about its validity or not." Maj. op. at 15; *also* maj. op. at 17 ("[I]n *Kirkpatrick*, United States courts were not called upon to decide whether the Nigerian contract was legally deficient under Nigerian law due to the bribes; all they were asked to decide is whether bribes were made.").

This oversimplifies the cause of action in *W.S. Kirkpatrick*. The *W.S. Kirkpatrick* plaintiff's various claims all depended on proving that the bribery induced Nigerian

officials to award the contract to the defendant, and that but for the bribes, the officials would have awarded the contract to plaintiff. *Kirkpatrick District Court Decision*, 659 F. Supp. at 1393. In other words, Nigerian officials' illegal corruption was a *determinative* issue. The question was not simply whether defendants paid a bribe, but whether the bribe caused the state act—which was why the district court originally dismissed the case. *Id.* at 1395. ("[I]nquiry would have to be had as to the effect of the payment or promise of payment of such a bribe, [and] whether in fact the payment or anticipation of the bribe caused the award of the Nigerian Contract to Kirkpatrick International[.]"). Contrary to the majority's assertion, the "occurrence" of bribery was virtually a given, since before plaintiff's suit the defendants pleaded guilty to violating the Foreign Corrupt Practices Act. *W.S. Kirkpatrick*, 493 U.S. at 401.

There simply is no meaningful distinction between this case and *W.S. Kirkpatrick*. In fact, the state action here is more removed: In *W.S. Kirkpatrick*, the plaintiff had to demonstrate but-for causation as to the state act itself, while here, all of Plaintiffs' claims relate to representations made (or not made) to investors. Plaintiffs need not show that but for corrupt Mexican government officials the 2012 APA Ruling would not have been issued, nor must they show that the 2012 APA Ruling was illegal or invalid.[4]

---

[4] The majority observes that "although a *juicio de lesividad* was filed, its contents, and the reasons for which it was filed, are not public." Maj. op. at 11; *also id.* ("Plaintiffs concede that the contents of the *juicio de lesividad* and the reasons for which it was filed are not public[.]"). "In reviewing the district court's dismissal for failure to state a claim, we accept the plaintiffs' allegations as true and construe them in the light most favorable to the plaintiffs." *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1170 n.2 (9th Cir. 2009). While the *juicio* may not be

Plaintiffs' alleged injuries were not caused by a legally deficient APA Ruling, but by alleged false and misleading statements and material omissions about Mexican taxes, the Ruling, and how the Ruling was (or wasn't) obtained. The question is not, as the majority contends, whether the 2012 APA Ruling is legally invalid, although Mexico evidently thinks so. The question is whether Defendants intentionally or knowingly made false, misleading, and/or legally insufficient statements about the Ruling and Mexican taxes, given the circumstances allegedly known to Defendants but not to Plaintiffs (like that the approving official's brother allegedly represented Defendants).

The majority argues that to prevail, Plaintiffs would have to show that the APA Ruling was invalid and that Defendants "knew that the APA Ruling was so invalidated at the time of its statements." Maj. op. at 17 n.1. Not so.

To prevail, Plaintiffs would need to show that Defendants' statements "affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed.]" *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).[5] According to Plaintiffs, Defendants told investors that the favorable Ruling was an all but permanent solution

---

public, its contents would be discoverable if the proceedings moved forward. At this stage, any uncertainty about the *juicio*'s exact contents should not be held against Plaintiffs. And, evidence submitted by Defendants—their NAFTA arbitration demand filed as an exhibit to their motion to dismiss—suggests that at least one of Plaintiffs' alleged defects (the flawed methodology) was a basis for the *juicio*.

[5] As the district court did not reach scienter, I assume, *arguendo*, that Plaintiffs have adequately established Defendants acted with the intent to mislead.

to the company's cash-flow problems. But unknown to Plaintiffs, when Defendants made this representation, Defendants knew that they obtained the Ruling through questionable means and that Mexico had begun investigating the Ruling and threatened to nullify it. Taking Plaintiffs' allegations as true, Defendants' statements affirmatively created an impression of a state of affairs that differed in a material way from the actual one—they created the impression that the Ruling provided a permanent solution, when in reality the Ruling was on shaky ground.

Reaching this conclusion would not implicate the act of state doctrine because a court can determine whether there was a risk that Mexico would seek to nullify the Ruling and whether Defendants' statements to investors improperly minimized that risk, without concluding that the Ruling is actually invalid. These types of findings might suggest that the Ruling is invalid, but like in *W.S. Kirkpatrick*, that is not enough to implicate the act of state doctrine.

And, if Plaintiffs were to prevail, a decision that Defendants misled investors would not invalidate the Ruling, just as a determination that the *W.S. Kirkpatrick* defendants procured their contract illegally did not mean the court was invalidating the contract.

## III.

The majority recognizes that "sometimes, even though the validity of the act of a foreign sovereign within its own territory is called into question, the policies underlying the act of state doctrine may not justify its application." Maj. op. at 20 (quoting *W.S. Kirkpatrick*, 493 U.S. at 409). In my view, the majority should have never reached this step of the analysis because the act of state doctrine is simply not

implicated here. But, even were that not true, the majority's analysis is deeply flawed.

The *Sabbatino* factors—codification or consensus on international law, the relative importance of an issue to foreign relations, and the continuing existence of the foreign government—are not exclusive, but part of "[t]he balance of relevant considerations" for assessing what impact the case could have on foreign relations. *Sabbatino*, 376 U.S. at 428; *see also W.S. Kirkpatrick*, 493 U.S. at 409 (explaining the *Sabbatino* factors are part of a "balancing approach" for evaluating whether "the policies underlying the act of state doctrine . . . justify its application"). In weighing the factors, "[t]he 'touchstone' or 'crucial element' is the potential for interference with our foreign relations." *Liu v. Republic of China*, 892 F.2d 1419, 1432 (9th Cir. 1989).

To assess any impact on our foreign relations, the primary question must be "[t]he political interest of [the foreign] country," *Sabbatino*, 376 U.S. at 428, as well as "the depth and nature of the [foreign] government's interest," *Liu*, 892 F.2d at 1432. After all, if the foreign country has little or no interest in the validity of an act of state, then the case should have little or no impact on foreign relations, and so there is no reason to apply the act of state doctrine. *See Sabbatino*, 376 U.S. at 428. If there is a consensus in international law on an issue, then the court need not grapple with "the sensitive task of establishing a principle" that could offend the foreign country; the less important an issue is to the foreign country, the less likely it is to impact foreign relations; and if the government that perpetrated the act of state is no longer in existence, then "the political interest of [the foreign] country may, as a result, be measurably altered." *Id.*

In analyzing each *Sabbatino* factor independently, the majority glosses over the crucial question—does Mexico have an interest in the continuing validity of the APA Ruling? If it does not, this case does not implicate "the policies underlying the act of state doctrine." *W.S. Kirkpatrick*, 493 U.S. at 409. Fortunately, the court does not have to speculate: By initiating proceedings to retroactively nullify the APA Ruling, Mexico has signaled that it does not have an interest in the validity of the 2012 APA Ruling—in fact, quite the opposite.[6]

The majority claims that because this case involves Mexico's natural resources, it "carr[ies] significant implications for U.S. foreign relations." Maj. op. at 22. It is not clear how or why that is, since any suggestion the 2012 APA Ruling was either inconsistent with Mexico's tax laws or improperly procured by the approving official's brother would be in keeping with Mexico's apparent position on those issues. Moreover, the relationship to Mexico's natural resources is far more attenuated here than in the two cases the majority cites. In *OPEC*, 649 F.2d 1354 and *Sea Breeze Salt*, 899 F.3d 1064, the plaintiffs were asking for injunctive relief that contradicted the countries' own decisions on the actual allocation of oil and salt. Here, by contrast, the requested remedy would be damages from Defendants— who are not associated with the Mexican government—

---

[6] The majority notes that "there are no allegations that the Mexican government has ruled on its *juicio de lesividad*." Maj. op. at 17. That may be because in July 2016, Defendants alleged discrimination under NAFTA and sought international arbitration. If the case moved forward, the current status of the *juicio* proceedings would presumably be discoverable. At a minimum, the court should not *infer* that Mexico is no longer interested in nullifying the 2012 APA Ruling, or that Mexico is choosing to enforce it, simply because the *juicio* has not resolved.

arising from statements generally about the tax treatment of sales of silver.

In asserting that the "very nature" of this action could offend Mexico, the majority quotes from *Sabbatino*: "An inquiry by United States courts into the validity of an act of an official of a foreign state under the law of the state . . . if wrongly made[] would be likely to be highly offensive to the state in question." Maj. op. at 22 (quoting *Sabbatino*, 376 U.S. at 415 n.17). Yet the majority omits the rest of the footnote:

> Were any test to be applied it would have to be what effect the decree would have if challenged in Cuba. If no institution of legal authority would refuse to effectuate the decree, its 'formal' status—here its argued invalidity if not properly published in the Official Gazette in Cuba—is irrelevant. It has not been seriously contended that the judicial institutions of Cuba would declare the decree invalid.

*Sabbatino*, 376 U.S. at 415 n.17.

The *Sabbatino* plaintiffs asked the Court not to enforce the state act because it would be invalid under Cuban law. *Id.* at 413. The Court rejected that argument—not because, as the majority claims, a court can never apply the law of a foreign state to a foreign act, but because the Cuban act "has been fully executed within the foreign state." *Id.* at 414. Neither *Sabbatino* nor any other Supreme Court case prohibits questioning a state act. And *Sabbatino* goes further, recognizing that evaluating a foreign act could be proper if "seriously contended" that the foreign country would "refuse to effectuate the decree" and would declare the act "invalid"

if challenged. That is, of course, precisely what Plaintiffs contend here. But, even more to the point, the issue here is not the actual validity of the APA Ruling—the issue is whether representations made (and not made) were false or misleading in violation of the laws of the United States.**[7]**

---

**[7]** Looking at *W.S. Kirkpatrick* from an investor's perspective proves enlightening. Defendants obtain an important state contract through bribery, illegal in Nigeria. Presume defendants then trumpet the contract without mentioning the bribery. Stock skyrockets. Nigeria brings up the bribery—stock plummets. Now, instead of a competitor suing under RICO, imagine defendants' *investors* suing for securities fraud, claiming false and misleading statements and material omissions about the contract. The act of state doctrine is no more implicated by this scenario than by the facts of *W.S. Kirkpatrick*. No matter what Nigeria were to ultimately decide about the validity of the contract, the act of state doctrine would not insulate the American defendants from securities-fraud liability based on their own affirmative statements and material non-disclosures. For this appeal, there is no difference between that hypothetical and the facts alleged. Here, had Defendants trumpeted the (alleged) use of the approving official's brother, as well as certain other facts about the process used to obtain the APA Ruling, the shares similarly wouldn't have skyrocketed (or so Plaintiffs claim). The act of state doctrine is equally irrelevant in both scenarios.

This hypothetical has played out in lower courts with no suggestion the act of state doctrine was implicated. In *In re Petrobras Sec. Lit.*, 116 F. Supp. 3d 368, 372–73 (S.D.N.Y. 2015), "[p]laintiffs allege[d] that Petrobras was at the center of a multi-year, multi-billion dollar bribery and kickback scheme [implicating Brazilian officials], in connection with which defendants made false and misleading statements in violation of the Securities Exchange Act of 1934, . . . the Securities Act of 1933, . . . and Brazilian law." The district court denied Petrobas's motion to dismiss. Similarly, in *Knox v. Yingli Green Energy Holding Co. Ltd.*, the district court found statements about a Chinese government subsidy program materially false and/or misleading because of widescale fraud related to procuring the subsidies: "[T]here was always a material risk that the government would eventually take *some* sort of drastic measure once it discovered the scale of the fraud." 242 F. Supp. 3d 950, 964 (C.D.

The purpose of the *Sabbatino* factors was to "avoid unquestioning judicial acceptance of the acts of foreign sovereigns," not to "expand[] judicial incapacities where such acts are not directly (or even indirectly) involved." *W.S. Kirkpatrick*, 493 U.S. at 409. Yet the majority's holding expands the act of state doctrine far beyond the narrow "principle of decision" mandated by the Supreme Court.

## IV.

Because it upheld the district court's act of state doctrine dismissal, the majority does not address whether Defendants' statements were misleading. Maj. op. at 24 n.3. I conclude that Plaintiffs sufficiently pleaded false or misleading statements to survive a motion to dismiss.

To be actionable under the securities laws, a statement must be either objectively false or materially misleading. *Brody*, 280 F.3d at 1006. Liability for non-disclosure of material information depends on whether disclosure was "necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5. As discussed above, to be misleading, a statement must "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody*, 280 F.3d at 1006. "[T]his materiality requirement is satisfied when there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information

---

Cal. 2017). The majority's holding would insulate companies engaging in misconduct abroad from liability to domestic shareholders, under domestic laws, for failing to disclose the misconduct and, as alleged here, directly profiting from that failure to disclose.

made available." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (internal quotation marks omitted).

Defendants touted the 2012 APA Ruling as a gamechanger without disclosing that its issuance might not hold up to scrutiny. According to Plaintiffs, the new administration of the Mexican government—which was elected on an anti-corruption platform—took one look at the Ruling and decided to make an example of it.

Plaintiffs allege that Defendants "likely were aware that its tax arrangements would be in the SAT's cross-hairs sooner or later," and indeed, Defendants' own exhibit shows that, at a minimum, Defendants knew Mexico had a problem with the 2012 APA Ruling before the *juicio* was filed and before making several of the allegedly misleading statements. During meetings with Defendants, Mexico complained about PEM's tax arrangements, threatened to "make an example" out of it, audited PEM for years covered by the Ruling, and suspended the company from its list of importers and exporters in the summer of 2015. Yet Defendants continued to reference the 2012 APA Ruling as if it were renewable and not under threat, telling investors in an SEC filing, "[i]n 2015 silver is expected to continue to be sold under the [APA] on the same terms and there are no known changes in the application of Mexican tax laws relative to the APA Ruling, so the Company expects to record revenues and pay taxes based on realized prices for the life of the San Dimas mine."

In August 2015, Mexico filed the *juicio* to nullify the APA Ruling retroactively. Yet Defendants filed a statement with the SEC in November 2015 about the application process for renewing the Ruling and stating that "[t]he Company continues to evaluate alternatives to achieve long-term tax certainty including through engaging in a dialogue

with Mexican tax authorities." Beyond Defendants' own statements about the events prompting the *juicio*, Plaintiffs allege that Defendants knew of the problems with the APA Ruling when they made allegedly false or misleading statements shortly after it was issued. Taking their allegations as true, Defendants knowingly made statements that "create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exists." *Brody*, 280 F.3d at 1006.

The boilerplate disclaimers ("[a]ssuming . . . there are no changes in the application of Mexican tax laws relative to the APA ruling . . .") only mention risks in the abstract, despite a higher-than-normal probability that the Mexican government would seek to nullify the Ruling retroactively. *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 986 (9th Cir. 2008) (finding disclosures misleading where "[n]othing alerts the reader that some of these risks may already have come to fruition"). In fact, in December 2013, Defendant Conway, Primero's CEO, told investors that the disclaimers only referred to changes "for the overall industry in terms of tax rules," and Defendants never backed away from that, even as Mexico showed increasing hostility toward the tax arrangement. It is hard to see how Defendants' statements could not be misleading in this context.

## V.

The act of state doctrine "does not bestow a blank-check immunity upon all conduct blessed with some imprimatur of a foreign government." *Timberlane Lumber Co. v. Bank of Am.*, 549 F.2d 597, 606 (9th Cir. 1976). As the Supreme Court observed in *W.S. Kirkpatrick*, "[c]ourts in the United States have the power, and ordinarily the obligation, to

decide cases and controversies properly presented to them." 493 U.S. at 409. The majority avoids that obligation today.

The implications of this decision extend far beyond this case. The act of state doctrine is extraordinarily limited and sparingly applied. The majority has expanded it so much that we can expect defendants to invoke it every time a case even touches on decisions of foreign states, and even if, as here, the relief sought is not invalidation of a foreign act of state. The complaint does not challenge state acts—it claims non-state actors profited from misrepresentations and willful non-disclosures.

I would reverse the district court's rulings that the act of state doctrine bars Plaintiffs' action and that Plaintiffs failed to adequately plead any materially false or misleading statements. I therefore respectfully dissent.